David McKENZIE and Kimberly McKenzie, as Co–Administrators of the Estate of Sydney R. McKenzie, deceased, and David McKenzie and Kimberly McKenzie, individually, Appellants

v.

WESTINGHOUSE ELECTRIC CORPORATION, a Pennsylvania Corporation; Vanport Township Municipal Authority, a Municipal Corporation; and Brighton Township Municipal Authority, a Municipal Corporation.

Commonwealth Court of Pennsylvania.

Argued March 14, 1996.

Decided April 15, 1996.

Keith R. McMillen, for Appellants.

George E. Yokitis, for Appellee, Westinghouse Electric Corp.

Before McGINLEY and PELLEGRINI, JJ., and NARICK, Senior Judge.

PELLEGRINI, Judge.

David and Kimberly McKenzie (McKenzies) appeal from a decision of the Court of Common Pleas of Beaver County (trial court) that granted a motion in limine and a motion for summary judgment filed by Westinghouse Electric Corporation (Westinghouse), the Vanport Township Municipal Authority (Vanport) and the Brighton Township Municipal Authority (Brighton).

On April 20, 1989, Kimberly McKenzie gave birth to a daughter, Sydney. Shortly after her birth, Sydney was diagnosed with a ventricular septal defect. After an unsuccessful surgery that attempted to correct the cardial defect, Sydney died on November 22, 1989. The McKenzies, individually and as the co-administrators of the estate of Sydney,

brought the present action in the trial court against Westinghouse, Vanport and Brighton. In their complaint, the McKenzies allege that Westinghouse utilized and stored trichloroethylene (TCE) at its facility located in Vanport Township, which eventually led to the contamination of the groundwater under, about and near its facility with both TCE and dichloroethylene (DCE). The McKenzies allege that Vanport provided the water contaminated by the TCE and DCE to Brighton, which in turn, provided the contaminated water to the residents of Brighton Township, including the McKenzies. The McKenzies contend that during the first trimester of her pregnancy with Sydney, Kimberly McKenzie used and consumed the contaminated water. The McKenzies allege that the contaminants in the water, TCE and DCE, are cardiac teratogens[1] which caused Sydney to be born with the cardial defect that eventually led to her death.

After all answers to the McKenzies' complaint had been filed, Westinghouse filed a motion in limine to exclude the McKenzies' expert testimony. In that motion, Westinghouse contended that the McKenzies were required to produce admissible expert testimony to support their contention that exposure to TCE and DCE actually caused Sydney to suffer a complete atrioventricular septal defect. Westinghouse argued that the McKenzies' expert on this issue, Stanley Goldberg, M.D., was relying upon several of his own studies to support the proposition that exposure to TCE caused Sydney's birth defect. Westinghouse argued that those studies, as well as the causal relationship between TCE and the birth defect, were not generally accepted by the teratological community, and therefore, Dr. Goldberg's testimony should be excluded from the trial. A similar motion was filed by Vanport.

Several hearings were held by the trial court on Westinghouse's and Vanport's motions in limine. The McKenzies offered by way of deposition and affidavit, the testimony of Dr. Goldberg, which centered upon the six studies that he performed which led him to

the conclusion that TCE and DCE are human teratogens. These studies were referred to by the trial court as follows:

1. Goldberg, S.J., Lebowitz, M.D., Graver, E., Jr., "An Association of Human Congenital Cardiac Malformations and Drinking Water Contaminants," J.Am.Coll.Cardiol.1990; 16: 155–64 (hereinafter "Tuscon Paper").

2. "Increased Birth Prevalence of Cardiac Defects in Yuma, Arizona," J.Am.Coll.Cardiol.1990; 16: 1696–1700 (hereinafter "Yuma Paper").

3. Loeber, C.P., Hendrix, M.J.C., Diez de Pinos, S., Goldberg, S.J., "Trichloroethylene: A Cardiac Teratogen in Developing Chick Embryos," Pediatr.Res.1988, 24: 740–5 ("Loeber Chick Paper").

4. Goldberg, S.J., Dawson, B.V., Johnson, P.D., Hoyme, H.E., Ulreich, J.B., "Cardiac Teratogenicity of Dichloroethylene in a Chick Model." Pediatr.Res.1992; 1: 23–26 ("Goldberg Chick Paper").

5. Dawson, B.V., Johnson P.D., Goldberg, S.J., Ulreich, J.B., "Cardiac Teratogenesis of Trichloroethylene and Dichloroethylene in a Mammalian Model," J.Am.Coll.Cardiol.1990; 16: 1304–1309 ("Rat Paper One").

6. Dawson, B.V., Johnson, P.D., Goldberg, S.J., Ulreich, J.B., "Cardiac Teratogenesis of Halogenated Hydrocarbon-Contaminated Drinking Water," J.Am.Coll.Cardiol.1993; 20: 1466–72 ("Rat Paper Two").

Dr. Goldberg testified that these studies were scientifically valid and employed methods that were generally accepted in the scientific community. He then explained that based upon his observations in the aforementioned studies, he had concluded that TCE was a teratogen that caused birth defects. In his affidavit, Dr. Goldberg stated that Kimberly McKenzie's exposure to TCE during the first trimester of her pregnancy was a substantial contributing factor in causing the congenital heart disease suffered by Sydney. Dr. Goldberg explained his opinion, stating that it was:

1. A teratogen is an agent which produces permanent structural alternations in the developing human fetus, as a result of exposure in utero.

based upon a consideration of a constellation of factors and ... not based upon a single study or a single piece of information. To the contrary, [his] opinion [was] a result of a combination of factors including ... [his] scientific studies ... as well as a review of the McKenzie medical history, the medical records of Sydney McKenzie and [his] personal experience as a pediatric cardiologist.

The McKenzies also introduced, by way of affidavit, the testimony of Allen S. Goldman, M.D., and Brenda V. Dawson, M.D. Dr. Goldman, a pediatrician who specializes in teratology, testified that Dr. Goldberg's studies employed classic research methodologies that are generally accepted in the scientific community. Dr. Goldman further stated that, when viewed collectively, Dr. Goldberg's studies establish that TCE is a cardiac specific human teratogen. Dr. Dawson, a board certified pathologist with special research interest and experience in reproductive toxicology using the rat model, testified as to the Rat Paper One, the Rat Paper Two, and the Goldberg Chick Study. She indicated that these studies were published in peer reviewed publications that are highly regarded in the area of pediatric cardiology. Publication after peer review, Dr. Dawson indicated, serves as an endorsement in the scientific community of the validity of the study.

Westinghouse presented the testimony of Robert L. Brent, M.D., Ph.D., who is the leading authority in the field of teratology, being referred to as "the father of teratology" by individuals in that field, including the McKenzies' expert witness, Dr. Goldberg. Dr. Brent began by stating that Dr. Goldberg's conclusions, as well as his studies supporting those conclusions, have not been accepted in the field of teratology. Dr. Brent explained that there are only six teratogens that are proven to cause heart malformations, and that TCE is not one of them. Dr. Brent proceeded to examine Dr. Goldberg's studies, pointing out flaws contained in the methodology and citing to other studies that clearly refute Dr. Goldberg's

findings. As to the Tuscon Paper and Yuma Paper, Dr. Brent explained that the few epidemiological studies of the teratological effects of TCE that have been done do not support Dr. Goldberg's conclusions. In fact, Dr. Brent stated, there are no consistent epidemiological studies that establish a connection between TCE and heart disease.

Westinghouse also presented the testimony of Edward Bowersox Clark, M.D., a professor and Chief of the Division of Pediatric Cardiology at the University of Rochester. Dr. Clark testified that his review of Dr. Goldberg's studies indicate that they were neither properly prepared nor documented. Dr. Clark explained that a teratogen does not affect just one organ, as suggested by Dr. Goldberg, but instead affects a group of organs that are closely related in the development process of a fetus. Dr. Clark also stated that in all of Dr. Goldberg's studies, there were a broad range of defects, thus indicating that the studies constituted sledge-hammer teratology.[2]

Finally, Westinghouse presented the testimony of Nancy Lee Day, M.D., a specialist in epidemiology. Dr. Day testified as to numerous flaws in the design of Dr. Goldberg's studies that were the basis for the Tuscon Paper and the Yuma Paper. Dr. Day indicated that those flaws refute any connection between TCE and heart malformations, and as such, the Tuscon Paper and the Yuma Paper cannot support Dr. Goldberg's opinion that Kimberly McKenzie's exposure to TCE during pregnancy caused Sydney's birth defects.

At the conclusion of the hearing, the trial court issued a memorandum and order granting the motion in limine and excluding Dr. Goldberg's testimony. In so doing, the trial court held that, based upon the scientific evidence presented at the hearing, Dr. Goldberg's opinion was not generally accepted by the relevant scientific community. The trial court further concluded that Dr. Goldberg's opinion was not derived from reliable scientific studies. While briefly explain-

---

**2.** As Dr. Clark explained, if an embryo is given too much of any one substance, including sugar or water, during the developmental process, there will be disruptions and defects that develop during that process.

ing the basis for its decision, the trial court indicated that an opinion was to follow.

Prior to the trial court's issuance of its opinion, Westinghouse filed a motion for summary judgment, stating that the sole evidence to support causation in the McKenzie's claim, the testimony of Dr. Goldberg, had been excluded by the trial court. Brighton joined in this motion, and Vanport also filed a motion for summary judgment on the same basis.

The trial court subsequently issued an opinion setting forth both its reasons for granting the motion in limine and the basis for entering summary judgment. As to the motion in limine, the trial court noted that TCE is not recognized as a teratogen by the teratologic community. The trial court then proceeded to analyze Dr. Goldberg's studies, citing to the numerous methodological flaws pointed out by the various medical experts during the hearing on the motion in limine. Based upon those flaws, the trial court concluded that, not only was Dr. Goldberg's opinion not generally accepted by the relevant scientific community, but that it was not derived from reliable scientific studies. Citing to the McKenzies' concession that they could not prove causation without Dr. Goldberg's testimony, the trial court then granted the motion for summary judgment. The McKenzies appeal to this Court.

■■ The McKenzies do not challenge the trial court's determination that Dr. Goldberg's finding that TCE is a human teratogen is not generally accepted in the teratological community. Instead, they argue the relevant inquiry in ruling on the admissibility of expert testimony is whether it has been established that the methodologies employed in a particular study, and not its results, have been accepted by the relevant community. If general acceptance of a study's methodologies has been established, the McKenzies argue, then the issue of whether an expert witness has made erroneous conclusions based upon that study must be determined by the trier of fact, and not the trial court in ruling on a motion in limine. Citing the facts that Dr. Goldberg's testimony was based upon animal and epidemiological studies, methodologies that are generally accepted in the scientific community, the McKenzies argue that the trial court erroneously excluded Dr. Goldberg's testimony.[3]

■■ In order for expert testimony to be admissible, the party seeking to offer that testimony must provide an adequate foundation for doing so. *Commonwealth v. Khamphouseane*, 434 Pa.Superior Ct. 93, 642 A.2d 490, *petition for allowance of appeal denied*, 538 Pa. 666, 649 A.2d 669 (1994). A party does not lay an adequate foundation for expert testimony simply by presenting the testimony of its witness that he or she believes a particular proposition to be true based upon his or her own personal views and observations. *Commonwealth v. Apollo*, 412 Pa.Superior Ct. 453, 603 A.2d 1023, *petition for allowance of appeal denied*, 531 Pa. 650, 613 A.2d 556 (1992). This is especially true where the party opposing the admission of such testimony adduces evidence to establish that the data and studies used to support the reliability of the expert's testimony have been criticized. *Id.* Moreover, the scientific principles upon which the expert's opinion relies cannot be based solely upon the views of a small segment of the relevant scientific community. *Commonwealth v. Middleton*, 379 Pa.Superior Ct. 502, 550 A.2d 561 (1988).

■■ In *Commonwealth v. Topa*, 471 Pa. 223, 369 A.2d 1277 (1977), our Supreme Court addressed the issue of what foundation must be provided for expert testimony and held that the admissibility of scientific evidence depends upon its general acceptance in the scientific field to which it belongs. Quot-

---

3. The admission of expert testimony lies within the discretion of the trial court, and a ruling that certain expert testimony is inadmissible will not be disturbed absent a clear abuse of that discretion. *Commonwealth v. Zook*, 532 Pa. 79, 615 A.2d 1 (1992), *cert. denied*, 507 U.S. 974, 113 S.Ct. 1420, 122 L.Ed.2d 789 (1993). An abuse of discretion occurs if the trial court's decision is manifestly unreasonable, is the result of prejudice, bias, or ill will, or constitutes a clear error of law. *Fraternal Order of Police, Lodge 5 v. City of Philadelphia*, 160 Pa.Cmwlth. 409, 635 A.2d 222 (1993), *petition for allowance of appeal denied*, 538 Pa. 616, 645 A.2d 1319 (1994); *Bodnar v. Columbia County Sanitary Administrative Committee*, 51 Pa.Cmwlth. 332, 414 A.2d 735 (1980).

ing *Frye v. United States*,[4] our Supreme Court stated that:

> Just when a scientific principle or discovery crosses the line between the experimental and the demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while the courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discover, *the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.*

*Id.* 471 Pa. at 231, 369 A.2d at 1277. The legal standard of admissibility set forth in *Frye* and adopted in *Topa* "assures that those most qualified to assess the general validity of a scientific method will have the determinative voice by requiring that *the principle or discovery forming the basis for evidence* presented at trial must have gained general acceptance in the particular field to which it belongs." *Commonwealth v. Rodgers*, 413 Pa.Superior Ct. 498, 510, 605 A.2d 1228, 1234 (1992) (emphasis added). For this reason, in order for scientific testimony indicating that an event causes a particular result to be admitted, there must be a showing, not that the studies establishing the causal relationship follow generally accepted methodologies, but that the existence of the causal relationship is generally accepted by the relevant medical community. *See Commonwealth v. Dunkle*, 529 Pa. 168, 602 A.2d 830 (1992) (rejecting testimony regarding child abuse syndrome because the uniformity of the behaviors of a sexually abused child was not sufficiently established to have been generally accepted in the relevant field); *Commonwealth v. Miller*, 367 Pa.Superior Ct. 359, 532 A.2d 1186 (1987) (rejecting expert testimony that a defendant's failure of the horizontal gaze nystagmus (HGN) test indicated that the defendant was intoxicated on the basis that the Commonwealth produced no evidence that the scientific principle underlying the HGN test, i.e., consumption of alcohol causes nystagmus, was generally accepted).

In light of the numerous cases applying the *Frye* test, the relevant inquiry in the present case is whether the scientific principle forming the basis for Dr. Goldberg's opinion has gained general acceptance in the field of teratology; it is not whether the methodologies employed in Dr. Goldberg's studies are scientifically valid.[5] In this regard, Dr. Goldberg's testimony was being offered to prove that Kimberly McKenzie's exposure to TCE and DCE during her first trimester of pregnancy caused Sydney's birth defect. The scientific principle forming the basis for Dr. Goldberg's opinion was that TCE and DCE are human teratogens that cause malformations in a developing fetus. Although Dr. Goldberg, as well as two other witnesses presented by the McKenzies, testified that the methodologies employed in Dr. Goldberg's studies were generally accepted in the scientific community, the McKenzies offered no evidence to establish that the conclusions from those studies are generally accepted in the teratological community, the specific medical field to which they belong. To the contrary, Westinghouse presented the testimony of Dr. Brent, the "Father of Teratology," who specifically stated that TCE and DCE are not recognized as human teratogens and that Dr. Goldberg's studies are not

**4.** *Frye v. United States*, 293 F. 1013 (D.C.Circ.1923). *Frye* has subsequently been superseded by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert*, the Supreme Court held that the Federal Rules of Evidence, not *Frye*, set forth the standard for the admission of expert scientific testimony. After *Daubert*, the critical issue in the determination of whether scientific evidence should be admissible is whether the expert's testimony is based upon a reliable foundation and is relevant. *Daubert*, *supra*. *Daubert*, however, is premised upon the Federal Rules of Evidence, which are not authoritative in Pennsylvania. *See*

*Commonwealth v. Crews*, 536 Pa. 508, 518–19 n. 2, 640 A.2d 395, 400 n. 2 (1994). Moreover, because no Pennsylvania case law has addressed the effect of *Daubert* on the continued viability of the *Frye* standard in Pennsylvania, and because neither party argues that *Daubert* makes Pennsylvania precedence applying the *Frye* standard obsolete, we need not address the applicability of *Daubert* to the present case.

**5.** As such, the trial court was not required to examine each of Dr. Goldberg's studies in detail for methodological flaws.

generally accepted in the field of teratology. Additionally, the testimony of Dr. Clark stated that Dr. Goldberg's studies do not establish that TCE and DCE are teratogens and, instead, only show the effects of sledgehammer teratology. Upon a review of the evidence presented, therefore, we cannot say that the trial court abused its discretion in excluding Dr. Goldberg's testimony on the basis that his underlying assumptions are not generally accepted in the field of teratology.[6]

Accordingly, the decision of the trial court is affirmed.

## ORDER

AND NOW, this 15th day of April, 1996, the orders of the Court of Common Pleas of Beaver County at No. 884 of 1991, dated March 21, 1995, and August 11, 1995, are affirmed.

---

6. The McKenzies also argue that the trial court failed to consider their evidence in a light most favorable to them in ruling on the motion for summary judgment. In light of the McKenzies' concession before the trial court that the only evidence that they were going to offer to establish causation was the testimony of Dr. Goldberg, and because it has been determined that Dr. Goldberg's testimony and the basis therefor are not generally accepted in the field of teratology, thus warranting the exclusion of his testimony, the McKenzies' case lacked any evidence to establish causation. Consequently, the trial court did not err in entering judgment in favor of Westinghouse, Brighton and Vanport.