Carl R. GRADY and Diana Grady, his wife, Appellants

v.

FRITO–LAY, INC., A Foreign Corporation, Appellee.

Superior Court of Pennsylvania.

Argued Sept. 5, 2001.

Filed Dec. 31, 2001.

John P. Joyce, Pittsburgh, for appellants.

John A. Robb, Pittsburgh, and Morton G. Forbes, Savannah, GA, for appellee.

Before DEL SOLE, President Judge, McEWEN, President Judge Emeritus, JOHNSON, FORD ELLIOTT, EAKIN, JOYCE, STEVENS, MUSMANNO and ORIE MELVIN, JJ.

McEWEN, President Judge Emeritus.

¶ 1 This appeal has been taken from the order which denied the motion of Carl and Diana Grady, hereinafter appellants, to remove a compulsory non-suit entered against them following the conclusion of the trial judge that appellants could not establish causation, an essential element of their cause of action, by reason of the pre-trial ruling excluding the testimony of their two expert witnesses. We are constrained to reverse and remand.

¶ 2 Appellants filed a six-count complaint[1] against appellee Frito–Lay, Inc., claiming that Mr. Grady had suffered an esophageal tear after eating five or six Doritos brand corn chips on April 5, 1993. The appellants alleged in the complaint that while eating the corn chips, Mr. Grady

experienced a sense of something getting stuck in the swallowing process in the area of his esophagus. After trying to alleviate the sensation of the Doritos being stuck and to further swallow what was stuck in his esophagus, Carl R. Grady drank four glasses of water to attempt to alleviate the pricking sensation he felt where some content of the Doritos snack had lodged, with eventual relief of the sensation. After returning home from work on April 6, 1993, Carl R. Grady felt weak, which resulted in his emergency hospitalization later that day, when it was revealed that he had been bleeding internally from an acute gastroesophageal tear.

Mr. Grady, who remained hospitalized for ten days after being diagnosed with a gastro-esophageal mucosal tear which had resulted in massive bleeding, instituted this action to recover damages for personal injuries and lost wages.

¶ 3 Once the pleadings were closed, appellee filed a motion for summary judgment based on the failure of appellants to produce, in response to discovery requests, any "medical testimony that would demonstrate that there is ·a causal relationship between the husband-plaintiff's consumption of Doritos chips and his resulting esophageal tear." Appellee also sought summary judgment on the basis of appellants' failure to produce any expert report, relating to the products liability claim, to establish that the corn chips were defective at the time they were manufactured and/or delivered to appellants, and that that defect caused the harm alleged by appellants.

---

1. The complaint set forth causes of action in negligence, strict liability, and breach of warranty, and included claims for loss of consortium and punitive damages.

¶ 4 Appellants, in their answer to the motion for summary judgment, attached the expert reports of Augusto N. Delerme, M.D., F.A.C.S, J.D., and Charles Beroes, Ph.D., P.E. Dr. Delerme, an otolaryngologist, stated in his expert report that after a review of the medical records and deposition of Mr. Grady, the discovery responses of Frito–Lay, and "research", he had concluded that

[b]ased upon the data available to me, it is clear that the Doritos Nacho chips, which Mr. Grady was attempting to eat, lacerated his esophagus on its passage down to the stomach. The laceration of the esophagus resulted in the bleeding that occurred thereafter. The absence of a history of severe retching or vomiting associated with this incident is against the laceration being a Mallory–Weiss tear or ulcer. The fast healing of the laceration goes along with those reported in the literature. The absence of a stricture or other esophageal abnormalities also fits the reported cases.

Based even upon the limited records of injuries provided by Frito–Lay, it is clear that its Nacho chips are physically capable of creating injuries to the mouth, including that of breaking and chipping teeth. The hardness of some of these Nacho chips and the sharpness of their edges as they are broken down, as demonstrated in a report from Charles S. Beroes, Ph.D., P.E., are sufficient to cause the injuries reported. There are several cases reported in medical literature which substantiate the danger to the digestive tract structures which tortilla type chips can cause including lacerations of the esophagus.

In my opinion, within a reasonable degree of medical certainty, the ingestion of the Doritos Nacho chips by Mr. Grady caused him to suffer a laceration of the esophagus. The manner in which Mr. Grady described his chewing of these chips was what would be normally expected in that process. It was the chip, or chips, which due to its peculiar characteristics, caused the injury to Mr. Grady as described. Finally, the care provided to Mr. Grady by St. Clair Hospital was necessary, and its bills were reasonable and appropriate.

¶ 5 The 23–page expert report of Dr. Beroes, Ph.D., P.E., an associate professor emeritus of chemical engineering at the University of Pittsburgh, opined, in part, that

The Doritos Tortillas Natural Cheese Flavored corn chips have several hidden-hazardous physical-strength and physical-shape properties which make them unreasonably dangerous. The majority of the chips are thick, hard, strong and because of oil coatings, do not quickly absorb the necessary saliva for softening the hard tips. The fact that sharp tips can build up considerable pressures at the tip when force is applied on the chip. [sic] An analogy is that a sharp chisel can cut hard steel. During chewing of the chips, the larger chips break into triangular smaller chips and very sharp tips. Experiments were conducted to measure and quantify these dangerous properties.

In the following series of tests, the arrow head shaped tips were held in the fingers pressed down on a platform gram balance. The balance was an OHAUS PRECISION STANDARD GRAM BALANCE, Model TS4KS, SERIAL NO. 5713, readability: 0.1 gram, capacity 4000 grams. The scale was tarred for each individual test with a soft Styrofoam pad. The chip was held firmly by the fingers and pressed down on the pad until the point snapped or crushed. The downward force necessary to crush the chip was measured in

grams. The tips or point diameters were measured in microns and assumed to be circles. The force required to break the chip tip was read in grams and recorded. The fragments of the chip were then stored for further examination. The test results establish that large pressures result when a few pounds of force are applied to the triangular shaped chips. The chip points were able to endure high pressures before fracturing. The sharp triangular chip tips can readily pierce the esophagus when driven into the walls of the esophagus by peristaltic action. This action on the flat wall of the chip drives the tip of the chip through the opposite esophagus wall.

¶ 6 The trial court, in response to the production of these reports, denied the motion for summary judgment by order dated December 9, 1998.

¶ 7 Appellee thereafter filed two motions *in limine* challenging the admissibility, under *Frye* [2], of the proposed expert testimony of Dr. Delerme and Dr. Beroes. The trial court granted these motions, finding:

> In this case, the Plaintiffs sought to "stack" the testimony of their two experts, Charles S. Beroes (hereinafter *Beroes*) and Augusto N. Delerme (hereinafter *Delerme*). In this case, the opinion of Delerme was not freestanding and depended for its efficacy upon the opinion of Beroes. On the other hand, the opinion of Beroes, taken alone, was insufficient to establish a nexus between the produce and the putative injury.

> It was the finding of this member of the Court, after taking into account the claimed expertise of the Plaintiffs' experts, and the methodology of Beroes, that Beroes' methodology was not based upon scientific data, or utilizing a methodology that was generally accepted in the community of scientists who evaluate food safety. Indeed, it was the impression of this member of the Court that Beroes' methodology smacked of a high school science fair project and did not bear any relationship to the reality of the mastication and consumption of foodstuffs. Beroes approached the characteristics of the Dorito chips as if it were a static evaluation of a material, rather than a consumable. Accordingly, this member of the Court determined that Beroes' methodology was akin to "junk science," did not meet the test of *Frye v. U.S.*, 54 App.D.C. 46, 293 F. 1013 (D.C.1923) and its progeny, and that Beroes' methodology and opinion would only mislead the jury. Beroes was otherwise unqualified to render an expert medical opinion as to whether the Doritos caused the husband-plaintiff's injury. The Defendant's motion *in limine* as to Beroes' opinion was, accordingly, granted.

> This member of the Court further determined that Delerme, as a medical professional, was not qualified to opine as to whether the Doritos chip caused the gastroesophageal tear which the husband-plaintiff apparently suffered. In his report, Delerme necessarily relied upon the opinion of Beroes. Without Beroes, Delerme's testimony had no support and was not competent on the issues raised in this case. Accordingly, the Defendant's motion *in limine* as to Delerme was granted.

¶ 8 Appellants argue that the reasoning of the trial court was flawed, and urge this Court to reverse that ruling and, concomitantly, the resulting non-suit entered on the grounds of the absence of any causation testimony.

2. *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (1923).

¶ 9 The expert testimony[3] of Dr. Delerme was excluded as incompetent by the trial court based on the determination that "Delerme, as a medical professional, was not qualified to opine as to whether the Doritos chip caused the gastro-esophageal tear which the husband-plaintiff apparently suffered." We are unable to concur in this conclusion.

¶ 10 The purpose of a *Frye* inquiry is to enable the trial court, acting as a gatekeeper and not as a fact-finder, to ensure the reliability and relevancy of "scientific, technical or other specialized" expert testimony. Pa.R.E. 702. Dr. Delerme, a medical doctor trained in otolaryngology and Board Certified in that specialty, was qualified by reason of his education and experience to offer an expert opinion on the cause of Mr. Grady's injury.

¶ 11 The standard governing a trial court's decision on the admissibility of the testimony of an expert is well established:

> Whether a witness has been properly qualified to give expert witness testimony is vested in the discretion of the trial court. *McDaniel v. Merck, Sharp & Dohme*, 367 Pa.Super. 600, 533 A.2d 436 (1987). Pennsylvania's standard for qualifying a witness as an expert is rather liberal—if the witness possesses knowledge with regard to a subject matter that is beyond the knowledge, information or skill possessed by the ordinary

juror, he or she may testify. *Ruzzi v. Butler Petroleum Co.* 527 Pa. 1, 588 A.2d 1 (1991).

*West Philadelphia Therapy Center v. Erie Insurance Group*, 751 A.2d 1166, 1167–1168 (Pa.Super.2000). "It is not a necessary prerequisite that the expert be possessed of all the knowledge in a given field, only that he possess more knowledge than is within the ordinary range of training, knowledge, intelligence or experience." *Miller v. Brass Rail Tavern*, 541 Pa. 474, 481, 664 A.2d 525, 528 (1995) (internal citation omitted). *See Pa.R.E. 702.*[4] The test that the trial court is to apply when qualifying an expert is "whether the witness has **any** reasonable pretension to specialized knowledge on the subject under investigation." *McClain v. Welker*, 761 A.2d 155, 156–57 (Pa.Super.2000) (emphasis in original) *appeal denied*, 565 Pa. 647, 771 A.2d 1286 (2001). If so, the witness may testify and the weight to be given such testimony is for the trier of fact to determine. *Id.*

¶ 12 The courts of this Commonwealth have frequently allowed individuals to provide expert testimony, despite a lack of formal training, provided that the individual can demonstrate knowledge of the subject which is greater than that of a lay individual. In *Miller v. Brass Rail Tavern, supra*, our Supreme Court held that a non-medically trained coroner could testify

---

**3.** No hearing was held in the instant case in response to the *Frye* motion. While a hearing is not necessarily required, the better practice in complex cases would appear to provide for such a hearing. *See: Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). *See also: Rauch v. Mike–Mayer*, 783 A.2d 815, 823 fn. 6 (Pa.Super.2001).

**4.** The Pennsylvania Rules of Evidence, specifically Rule 702, address the admissibility of *testimony by experts.* Rule 702 provides:

> If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Pa.R.E. 702.

as to time of death, despite his lack of formal medical training, because his experience as a coroner had provided him with specialized knowledge regarding the calculation of time of death which would not otherwise be known to a lay individual. *Id.* at 483, 664 A.2d at 529. In *McClain v. Welker, supra,* the trial court ruled that expert testimony on the causation of cognitive defects from an individual with a Ph.D. in neuroscience was inadmissible because the expert did not possess a medical degree. This Court reversed, finding that although the expert did not possess formal medical training, he possessed "more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience." *Id.* at 157. This Court in *Gunn v. Grossman,* 748 A.2d 1235 (Pa.Super.2000), *appeal denied,* 564 Pa. 711, 764 A.2d 1070 (2000), affirmed the decision of the trial court to allow an infectious disease specialist to testify as to the standard of care required of a cardiologist in prescribing antibiotics. In so holding, we noted that despite the difference in areas of specialty, the relevant issues were within the realm of knowledge of any doctor who prescribes drugs. *Id.,* 748 A.2d at 1244. *See also: Poleri v. Salkind,* 453 Pa.Super. 159, 683 A.2d 649 (1996), *appeal denied,* 548 Pa. 672, 698 A.2d 595 (1997) (where this Court held that a board certified orthopedic surgeon was qualified to testify regarding the applicable standard of care of a physiatrist because wound care is an area in which the specialties overlap).

■ ¶ 13 As our distinguished colleague Judge Joseph A. Hudock recited in *Rauch v. Mike–Mayer,* 783 A.2d 815 (Pa.Super.2001).

In the field of medicine, specialties sometimes overlap and a practitioner may be knowledgeable in more than one field. *Bindschusz v. Phillips,* 771 A.2d 803, 808–09 (Pa.Super.2000). Different doctors will have different qualifications. *Id.* at 809. Some doctors will be more qualified than others to provide evidence about specific medical practices. *Id.* However, it is for the jury to determine the weight to be given to expert testimony in light of the qualifications presented by the witness. *Id.*

The expert reports in this case were both provided by medical doctors. James R. Merikangas, M.D., represents that he is certified in Neurology by the American Board of Psychiatry and Neurology. *See* Expert Report of James R. Merikangas, M.D., 10/15/99, at 2. Appellees do not dispute that Dr. Merikangas has been board certified as a neurologist. However, Appellees do contend that Dr. Merikangas has devoted his time over the last decade to the practice of psychiatry and not neurology. Such a contention goes to the degree of trust to be placed in Dr. Merikangas' testimony, but not to the question of whether he is a qualified medical expert. *See* footnote 6, *infra.*

*Id.* at 821, *Accord: Smith v. Grab,* 705 A.2d 894, 900 (Pa.Super.1997); *Taliferro v. Johns–Manville Corp.,* 421 Pa.Super. 204, 617 A.2d 796, 803 (1992). Thus, Dr. Delerme, as a board-certified otolaryngologist, was qualified to express an opinion as to the cause of the esophageal tear suffered by Mr. Grady.

■ ¶ 14 Dr. Delerme also referred to the articles attached to Dr. Beroes' report detailing similar injuries caused by corn chips. These articles were all published in prestigious peer-reviewed journals, including *The American Journal of Gastroenterology* [5], the *New England Journal of Med-*

---

**5.** "Tortilla Corn Chip—Associated Esophageal Perforation: An Unusual Presentation ACH

ALASIA."

*icine*[6], (the article described corn chip esophageal tear of 63-year-old patient and included the information that the author was able to easily incise the mucosa of the esophagus of a cadaver with a broken tortilla chip); *Annals of Emergency Medicine*[7], and the *American Roentgen Ray Society*[8].

> In the absence of his own study, an expert reasonably can turn to medical literature in the relevant field as the basis for reaching an opinion. *See: Mazur v. Merck & Co., Inc.*, 742 F.Supp. 239 (E.D.Pa.1990) (expert relied on medical studies discussing possible link between vaccine and disease).

*Taliferro v. Johns–Manville Corp., supra* at 803 (Pa.Super.1992). Thus, it was error to preclude the expert opinion of Dr. Delerme.

¶ 15 Nor do we find that the trial court properly precluded that part of the expert testimony of Dr. Beroes relating to the results of tests he had conducted on the Doritos chips,[9] specifically, three series of compressive strength tests, and four sets of saliva tests conducted on whole chips. Rather, we are of the mind that Dr. Beroes was competent to testify as to the physical characteristics of the chips as revealed by the standard tests he had conducted upon the products of appellee.

■ ¶ 16 The *Frye* test makes the admission of expert testimony dependent "upon the general acceptance of its validity by those scientists active in the field to which the evidence belongs." *Common-*

*wealth v. Topa*, 471 Pa. 223, 231, 369 A.2d 1277, 1281 (1977).

In short, the gatekeeping responsibility of the trial court is not to weigh the correctness of an expert's opinion, or to choose between conflicting opinions, or to analyze and study the science in question in order to reach its own conclusions from materials in the field. Ultimately, it is the role of the trial court as gatekeeper to

> ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167.

*Travelers Property & Casualty Co. v. General Electric Co.*, 150 F.Supp.2d 360, 364 (D.C.Conn.2001).

■ ¶ 17 The process of consuming food involves both mechanical and chemical processes. The mechanical processes involve chewing and swallowing while the breaking down of the food involves chemical processes. Thus, an engineer such as Dr. Beroes is qualified to provide expert opinion describing the composition and characteristics of the food product and the mechanics of the processes involved in chewing and swallowing. The series of tests conducted by Dr. Beroes did not involve any novel or new scientific principles, but rather crush strength and com-

6. "Esophageal Tear Caused by a Tortilla Chip."

7. "Corn Chip Laceration of the Esophagus or Evaluation of Suspected Esophageal Perforation."

8. "Food Laceration of the Esophagus: The Taco Tear."

9. That portion of the expert testimony of Dr. Beroe's relating to the cause of Mr. Grady's esophageal tear was properly excluded as a chemical engineer is not competent or qualified to provide medical causation testimony. *See: Flanagan v. Labe*, 547 Pa. 254, 690 A.2d 183 (1997).

pression strength calculations which, as noted by appellants, are possibly "as old as the pyramids."

¶ 18 While appellee has provided valid criticisms of aspects of Dr. Beroes' tests, those criticisms do not attack the basic scientific principles involved in the tests conducted, but rather challenge such things as the use of a whole chip rather than the fragments yielded by chewing.

The requirement of general acceptance in the scientific community assures that those most qualified to assess the general validity of a scientific method will have the determinative voice. Additionally, the *Frye* test protects prosecution and defense alike by assuring that a minimal reserve of experts exists who can critically examine the validity of a scientific determination in a particular case. Since scientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury of laymen, the ability to produce rebuttal experts, equally conversant with the mechanics and methods of a particular technique, may prove to be essential.

*Wack v. Farmland Industries, Inc.*, 744 A.2d 265, 269 (Pa.Super.1999), *appeal denied*, 565 Pa. 649, 771 A.2d 1287 (2001) (citations omitted).

¶ 19 The tests, which employed standard calculations, can and have been readily examined and critically evaluated by experts in the field, including those retained by appellee. Such measurements are not "junk science", and any flaws in the design of the tests or compilation of the data can be readily critiqued by appellee.

¶ 20 As noted by the U.S. District Court for the District of Connecticut in discussing the gatekeeping role of the trial court:

although GE has raised some very strong points about the way in which [the expert] conducted his investigation,

the data he collected and the way it was analyzed—including the probative value of certain tests he performed *after* the issuance of his report—the court believes that those concerns are, under the circumstances of this case, more appropriately the subject of what will no doubt be a rigorous cross-examination. *See, e.g.*, Advisory Committee Notes, 2000 Amendments, Fed.R.Evid. 702 ("The trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.") (quoting *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir.1996)). As the Court in *Daubert* stated: "Vigorous cross-examination, presentation of contrary evidence and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786; *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir.1994) (proponents "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable .... The evidentiary requirement of reliability is lower than the merits standard of correctness.") *Ruiz–Troche v. Pepsi Cola*, 161 F.3d 77, 85 (1st Cir.1998).

*Travelers Property and Casualty Co. v. General Electric, supra* at 366.

¶ 21 Thus, as we are constrained to reverse the order which granted the motions *in limine*, we vacate the judgment of nonsuit and remand for trial.

¶ 22 Order vacated. Case remanded. Jurisdiction relinquished.

¶ 23 DEL SOLE, President Judge files a Concurring Statement in which Ford Elliott and Orie Melvin, JJ., join.

¶ 24 JOYCE, J. files a Concurring and Dissenting Statement.

¶ 25 EAKIN, J. files a Dissenting Opinion in which Stevens, J., joins.

DEL SOLE, President Judge, Concurring.

¶ 1 I join the opinion of President Judge Emeritus McEwen. However, I believe it appropriate to address the question of who has the burden of proof when expert testimony is challenged.

¶ 2 In my view, when a pre-trial motion is filed challenging an expert, commonly referred to as a *Frye* hearing, it is the movant who must establish that the expert is not qualified to testify. In that situation, the burden of proof should not be placed on the respondent to establish qualifications.

JOYCE, J., Concurring and Dissenting.

¶ 1 The majority opinion written by President Judge Emeritus McEwen and the dissenting opinion of Judge Eakin both offer compelling reasons for their respective conclusions. I am however, constrained to write separately.

¶ 2 Initially, I unreservedly join that part of Judge Eakin's dissent that would affirm the disallowance of Dr. Charles Beroes' testimony. The trial court correctly granted Appellee's motion *in limine* with respect to Dr. Beroes.

¶ 3 Nevertheless, I join that part of the majority that would permit the testimony of Dr. Augusto Delerme. The majority and the dissent correctly set forth the liberal standard for qualifying expert testimony. "The test to be applied when qualifying an expert witness is whether the witness has **any** reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimo-

ny is for the trier of fact to determine." *Miller v. Brass Rail Tavern*, 541 Pa. 474, 480–81, 664 A.2d 525, 528 (1995) (emphasis in original) (internal citations omitted). The majority recognizes Dr. Delerme is an otolaryngologist, and his testimony was not solely based upon Dr. Beroes findings. Dr. Delerme's findings also referred to medical literature on the subject, and any lack of specific expertise Dr. Delerme may have in esophageal tears, would go to the weight of Dr. Delerme's testimony and not its admissibility. *See id.* Accordingly, I join the majority with respect to the admissibility of Dr. Delerme's testimony.

EAKIN, J., Dissenting.

¶ 1 While my esteemed colleagues offer a persuasive position, I am compelled to dissent.

¶ 2 An expert witness must possess "more expertise than is within the ordinary range of training, knowledge, intelligence, or experience." *Flanagan v. Labe*, 547 Pa. 254, 690 A.2d 183, 185 (1997).

> In order for expert testimony to be admissible, the party seeking to offer that testimony must provide an adequate foundation for doing so. A party does not lay an adequate foundation for expert testimony simply by presenting the testimony of its witness that he or she believes a particular proposition to be true based upon his or her own personal views and observations. This is especially true where the party opposing the admission of such testimony adduces evidence to establish that the data and studies used to support the reliability of the expert's testimony have been criticized. Moreover, the scientific principles upon which the expert's opinion relies cannot be based solely upon the views of a small segment of the relevant scientific community.

*McKenzie v. Westinghouse Electric Corp.,* 674 A.2d 1167, 1171 (Pa.Cmwlth.1996) (citations omitted), *appeal denied,* 547 Pa. 733, 689 A.2d 237 (1997).

¶ 3 The *Frye* test[10] provides, "[a]dmissibility of the evidence depends upon the *general* acceptance of its validity by those scientists active in the field to which the evidence belongs." *Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277, 1281 (1977) (emphasis in original). The *Frye* test is used to assure the quality of expert scientific evidence prior to admission, so as not to mislead jurors with untrustworthy evidence. *Blum v. Merrell Dow Pharmaceuticals, Inc.,* 705 A.2d 1314, 1317 (Pa.Super.1997), *aff'd.,* 564 Pa. 3, 764 A.2d 1 (2000). Both the theory and technique underlying novel scientific evidence must be generally accepted by the relevant scientific community. *Commonwealth v. Blasioli,* 552 Pa. 149, 713 A.2d 1117, 1119 (1998).

¶ 4 The Gradys sought to present the testimony of Charles S. Beroes, Ph.D., an Associate Professor Emeritus of Chemical Engineering at the University of Pittsburgh, whose expertise is in the area of fire retardation. Dr. Beroes submitted a lengthy report describing his research, investigation, testing and document review, and opined:

- Frito–Lay failed to warn Mr. Grady of the danger of lacerating portions of his digestive tract when he ingested the Doritos;
- Frito–Lay failed to conduct appropriate safety tests regarding such danger;

- Frito–Lay failed to manufacture the product in question with uniform characteristics, such as hardness and compressive strength;
- Frito–Lay failed to warn consumers of the risk that its product could break teeth and cause other mouth injuries;
- Frito–Lay stated (in discovery) its consumers assumed the risk of such dangers but failed to identify such risk on its packaging;
- The Frito–Lay product in question was not fit for the purpose for which it was intended (safe consumption);
- The Frito–Lay product was negligently manufactured and designed, and was a dangerously defective product;
- Frito–Lay's negligence and the inherent dangerousness of its product caused the injuries suffered by Mr. Grady.

Dr. Beroes based his opinions about the dangers of these chips on his testing of physical characteristics of Doritos; he sought to measure their compressive strength, and reviewed medical literature on corn chip tears of the esophagus. In its motion *in limine,* Frito–Lay challenged the methodology of Dr. Beroes.

¶ 5 Dr. Beroes pressed the pointed tips of the chips from two bags of Doritos (one dry, one moistened with saliva) into a Styrofoam pad on a platform gram balance, to measure the force necessary to crush the chip. The trial court was particularly critical of Dr. Beroes' methodology, finding it "smacked of a high school science fair project and did not bear any relationship to the reality of the mastication and con-

10. The majority quotes *Travelers Property & Casualty Co. v. General Electric Co.,* 150 F.Supp.2d 360, 364 (D.C.Conn.2001) which relies upon *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). However, in the eight years since *Daubert* was decided, the Pennsylvania Supreme Court has not held that its more relaxed standard supersedes or modifies the *Frye* test in Pennsylvania. *See* Pa.R.E. 702, Comment—1998; *Blum v. Merrell Dow Pharmaceuticals, Inc.,* 564 Pa. 3, 764 A.2d 1 (2000).

sumption of foodstuffs." Trial Court Opinion, 4/3/00, at 3. Characterizing Dr. Beroes' methods as "akin to junk science," the court concluded such methodology "was not based upon scientific data, or utilizing a methodology that was generally accepted in the community of scientists who evaluate food safety." *Id.* The court also determined Dr. Beroes was not qualified to render a medical opinion as to causation.

¶ 6 The majority concludes compressive strength studies and the scientific principles involved in them are not novel. Assuming this is true in the abstract, I cannot say the trial court erred when it rejected Dr. Beroes' methods. There is no reason in the record to believe this product was normally tested in such a rudimentary manner. Whether Dr. Beroes used an accepted method of measuring compressive strength or not, the record has no evidence regarding the validity of his methods or conclusions. Not surprisingly, Frito–Lay's expert, Dr. Martin Okos, criticizes the validity of the report. There simply are too many questions unanswered; the absence of such answers cause me to be unable to criticize the court's conclusions.

¶ 7 The Gradys complain this is because the trial court failed to hold a *Frye* hearing to test the validity of the report after argument in chambers; the trial court on the record stated only that Dr. Beroes' testimony does not meet the *Frye* test and that Dr. Beroes was giving testimony outside his area of expertise.[11]

¶ 8 For expert testimony to be admissible, the party proffering that testimony must provide an adequate foundation for doing so. *McKenzie*, at 1171. Self-serving assertions in this regard simply are not

conclusive. *See Blum*, at 1323. The Gradys had the "burden of proving that their experts' reasoning and methodology—let alone their conclusions—were generally accepted by the relevant scientific communities." *Id.*, at 1321. I see nothing in the record to suggest the Gradys were prepared to meet this burden. By time of trial, discovery was over. If the parties' experts were deposed, their testimony was not made part of the record. Dr. Beroes' own report did not attempt to lay a foundation as to the general acceptance of his methods in the engineering community. Even now, in their brief to this Court, I see no suggestion the Gradys have any evidence to support the foundation necessary for admission of Dr. Beroes' testimony.

¶ 9 Assuming *arguendo* that this opinion would pass the *Frye* test, Dr. Beroes' report still fails to address the vital question of how his methods and conclusions translate to the human body. For example, would it matter to the conclusion how fast or thoroughly one chews? Does it matter which teeth are used? Do teeth differ from a thumb on the Styrofoam block? How rapidly does saliva affect the chip? Apart from the parties' briefs and argument on Frito–Lay's motion *in limine*, there is little of record about whether Dr. Beroes' proposed testimony would pass muster under *Frye*.

¶ 10 We are not told how the compressive strength of Doritos as measured on a Styrofoam pad is relevant to the compressive strength of Doritos when chewed and then applied to human tissue in the esophagous. While perhaps more than a science fair project, the manifest differences between this methodology and basic masti-

---

11. The better course would have been to hold a *Frye* hearing. Instead, the trial court's opinion and the record reflect the parties acquiesced to argument regarding the mo- tions *in limine* filed by the defendants. Neither party has presented the lack of a *Frye* hearing as an issue on appeal.

cation cry out for more than is found here. Dr. Beroes' analysis makes a leap of logic in this and other questions, and the trier of fact cannot be expected to fill in the gaps.

¶ 11 The trial court determined Dr. Delerme's opinion was not freestanding, but rather was dependent on Dr. Beroes' opinion; since that opinion was excluded, the court held Dr. Delerme's opinion must also be excluded. The court also determined Dr. Delerme's opinion was outside his realm of expertise.

¶ 12 Although Dr. Delerme does rely on the conclusions of Dr. Beroes, that is not the sole basis of his conclusions; he also relies on Grady's medical records, certain medical literature and information provided by Frito–Lay. To that extent, Dr. Delerme's report is self-supporting; exclusion of Dr. Beroes' report would not be enough, on its own, to exclude Dr. Delerme's report.

¶ 13 The trial court found Dr. Delerme was operating out of his area of expertise. The standard for admission of expert testimony is a liberal one: the proffered expert may testify so long as he has any reasonable pretension to specialized knowledge in the area in question. *Miller v. Brass Rail Tavern, Inc.*, 541 Pa. 474, 664 A.2d 525, 528 (1995). It is the trier of fact's role to determine the weight to be given such testimony. *Id.* In reviewing this determination, we are governed by an abuse of discretion standard. *McKenzie*, at 1171 n. 3. Whether this Court would have allowed

Dr. Delerme's testimony on the basis of his medical expertise is of no moment.

¶ 14 "[E]xperts in one area of medicine may be found to be qualified to address other areas of specialization where the specialties overlap in practice, or where the specialist has had experience in a selected field of medicine." *Chanthavong v. Tran,* 452 Pa.Super. 378, 682 A.2d 334, 338 (1996). The trial court was persuaded Dr. Delerme's expertise was in a different area of the human body than that involved in Mr. Grady's injury—in other words, the ear, nose, neck and larynx are too far away from the point of the tear, where the esophagus enters the stomach. Simply because the path of the chip passed from one to the other does not make these areas of the body subject to the same medical considerations. Since the record contains no evidence connecting the physiology of these areas, I cannot conclude the trial court's decision amounts to an abuse of discretion.[12]

¶ 15 Accordingly, I offer this respectful dissent.

---

**12.** The Gradys also contend the trial court erred in entering a compulsory nonsuit since a judge of coordinate jurisdiction entered a prior order denying a motion for summary judgment which challenged the same experts. In their post trial motion to remove the nonsuit, the Gradys did recount the fact of the summary judgment motion and its denial, but did not contend the entry of nonsuit was precluded by that earlier ruling. Accordingly, they failed to preserve the issue and I would

find it is waived. *Kraus v. Taylor,* 710 A.2d 1142, 1146 (Pa.Super.1998), *appeal dismissed,* 560 Pa. 220, 743 A.2d 451 (2000); *Brown v. Philadelphia Tribune Co.,* 447 Pa.Super. 52, 668 A.2d 159, 162 (1995), *appeal denied,* 544 Pa. 621, 675 A.2d 1241 (1996), *cert. denied,* 519 U.S. 864, 117 S.Ct. 173, 136 L.Ed.2d 114 (1996). Since the Gradys did not raise the issue, we do not have the benefit of the trial court's reasoning on the question.