Thomas MAGETTE, Administrator of the Estate of Joanne Magette, Deceased, Appellant,

v.

David A. GOODMAN, M.D., and Abington Memorial Hospital, Appellees.

Superior Court of Pennsylvania.

Argued Nov. 1, 2000.

Filed March 6, 2001.

Reargument Denied May 11, 2001.

Howard J. Levin, Philadelphia, for appellant.

Donald F. Ladd, Philadelphia, for Goodman, appellee.

Before JOYCE, J., OLSZEWSKI, J. and CIRILLO, President Judge Emertitus.*

OLSZEWSKI, J.:

¶ 1 Thomas Magette, as administrator of the estate of his late wife, Joann Magette, appeals from judgment of the Court of Common Pleas denying his motion for a new trial. We reverse and remand for a new trial.

¶ 2 The trial court aptly summarized the facts:

The evidence presented at trial established that Ms. Magette was admitted to the hospital on the morning of May 23, 1990 for spinal fusion surgery. At the outset of the procedure, Ms. Magette was placed under anesthesia by Dr. Goodman. Dr. Goodman monitored Ms. Magette's condition under anesthesia from approximately 10:45 AM until 3:55 PM, at which point he left the operating room and Nurse Patterson assumed responsibility for monitoring Ms. Magette. Ms. Magette's condition remained stable for the entire period Dr. Goodman was in charge of her anesthesia. Although Dr. Goodman initially expected to return to the operating room, an emergency caesarian delivery required Dr. Goodman's presence elsewhere, and he did not return to the operating room until after Ms. Magette had "coded."

Nurse Patterson testified to the following:

Ms. Magette's surgical procedure was completed at approximately 4:40 PM and the surgeon at this point began the process of closing the incision (N.T., September 14, 1999, p. 38). At 4:45 PM. [sic] Nurse Patterson began preparations for removing Ms. Magette from anesthesia. Nurse Patterson observed no signs of trouble with Ms. Magette at this point (N.T., September 14, 1999, p. 73, pp. 96–97). At approximately 4:45 PM, Nurse Patterson switched off the ventilator to determine if Ms. Magette "was coming back from the muscle relaxant" and would be able to breathe on her own (N.T. September 14, 1999, p. 46). Nurse Patterson switched Ms. Magette to "bag mode" and assisted her respirations manually for approximately fifteen (15) seconds, determining that Ms. Magette indeed was recovering from the relaxant. Nurse Patterson then switched the ventilator back on (N.T., September 14, 1999, pp. 46–49). Within two (2) minutes of restarting the ventilator, the blood pressure monitor sounded an alarm. When Nurse Patterson checked the monitor, it showed "two zeros," indicating that Ms. Magette's blood pressure had dropped to a systolic rate of sixty (60) or below (N.T., September 14, 1999, pp. 49–50). Nurse Patterson was not extremely concerned at this point because Ms. Magette's blood pressure had been stable throughout the

* P.J.E. Cirillo did not participate in the consideration or decision of this case.

surgery, and she knew that the alarm could easily be set off by accident, such as by a person leaning against the blood pressure cuff (N.T., September 14, 1999, pp. 50–53, pp. 117–118). Nurse Patterson reset the blood pressure monitor to get another reading and, thirty seconds later, the alarm sounded again and the monitor again registered "zero" (N.T., September 14, 1999, p. 53). Nurse Patterson at this point looked at the EKG monitor and· [stated] "I didn't see a heart rate" (N.T., September 14, 1999, p. 53). The pulse oximeter's tone previously stable began dropping, indicating a decrease in oxygen saturation, and the alarms for the ventilator, the EKG monitor, and the $CO_2$ monitor all began sounding (N.T., September 14, 1999, pp. 118–119).

Nurse Patterson now knew that something was seriously wrong and, at approximately 4:55 PM, a "code" was called, and the on-call anesthesiologist and a cardiologist were summoned and began resuscitation efforts. These proved unsuccessful, and Ms. Magette was pronounced dead at 5:47 PM.

Trial Court Opinion, 6/7/00, at 6–8. Appellant brought this action against the hospital and the anesthesiologist in charge during Ms. Magette's surgery. The trial court granted the anesthesiologist's motion for nonsuit, leaving the hospital as the sole defendant. *See id.* at 2. The jury returned a verdict in favor of appellee. *See id.* After the trial court denied appellant's motion for a new trial, this appeal followed.

¶ 3 Appellant raises the following questions:

1. Whether the trial court erroneously failed to submit plaintiff's proposed point for charge on *res ipsa loquitur*, where plaintiff presented sufficient evidence for such an instruction?

2. Whether the trial court erroneously failed to submit plaintiff's proposed point for the charge on the missing evidence of the EKG strip, where defendants threw away the EKG strip that was directly relevant to the alleged negligence, was relevant to the credibility of the defendants' fact witnesses' version of the events in question, and which was destroyed without satisfactory explanation?

3. Whether the trial court failed to clarify the jury's question and confusion regarding the missing EKG strip and thereby caused an incorrect result?

Appellant's brief, at 4.

¶ 4 In addressing appellant's first claim, we follow the rule set out in *Sweitzer v. Dempster*, 372 Pa.Super. 449, 539 A.2d 880, 881–82 (1988) (citations omitted):

Our scope of review in assessing a trial court's denial of a motion for a new trial is whether the trial court clearly and palpably abused its discretion or committed an error of law which controlled the outcome of the case. Where the motion for a new trial is based upon the sufficiency of the jury charge, we must examine the charge in its entirety against the background of the evidence to determine whether error was committed. If an appellate court concludes that the charge was erroneous, a new trial will be granted only if the jury charge might have prejudiced appellant.

*See also Collins v. Cooper*, 746 A.2d 615, 617 (Pa.Super.2000) (applying a "deferential standard of review" when assessing an appeal from a trial court's denial of a new trial; decision will not be overturned "unless the trial court grossly abused its discretion or committed an error of law that controlled the outcome of the case").

¶ 5 Appellant contends that the trial court should have given a *res ipsa loquitur* instruction to the jury, because he raised

sufficient evidence during the trial to support the charge. This Court stated the standard for a *res ipsa loquitur* charge as follows:

> *Res ipsa loquitur* is a short-hand expression for a rule of evidence which allows a jury to infer the existence of negligence and causation where the injury at issue is one that does not ordinarily occur in the absence of negligence. *Gilbert v. Korvette, Inc.*, 457 Pa. 602, 327 A.2d 94 (1974). A plaintiff is entitled to a jury instruction on *res ipsa loquitur* where she has satisfied the requirements of the Restatement (Second) of Torts § 328 D. The Pennsylvania Supreme Court adopted this section of the restatement in *Gilbert v. Korvette, Inc., supra*. The restatement (Second) of Torts § 328 D states in relevant part:
>
> (1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when
>
> > (a) the event is of a kind which ordinarily does not occur in the absence of negligence;
> >
> > (b) other responsible causes, including the conduct of the plaintiff and third person, are sufficiently eliminated by the evidence; and
> >
> > (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.
>
> The Restatement (Second) of Torts, Comment e on Clause (a) of Subsection (1) elaborates upon the plaintiff's burden to show the above elements. It provides in relevant part:
>
> > The plaintiff's burden of proof ... requires him to produce evidence which will permit the conclusion that it is more likely than not that his injuries were caused by the defendant's negligence. Where the probabilities are at best evenly divided between negligence and its absence, it

becomes the duty of the court to direct the jury that there is no sufficient proof. The plaintiff need not, however, conclusively exclude all other possible explanations, and so prove his case beyond a reasonable doubt. . . .

*Sedlitsky v. Pareso*, 400 Pa.Super. 1, 582 A.2d 1314, 1315–16 (1990) (citing Restatement (Second) of Torts § 328 D(1)(a) cmt. e).

■ ¶ 6 Instantly, appellant has failed to meet the burden necessary to sustain a *res ipsa loquitur* charge. First, appellant has not shown that Ms. Magette's death is not the type to occur in the absence of negligence. As the trial court noted:

> [N]owhere in his testimony does [appellant's expert] Dr. Weinberger make a clear statement that sudden deaths from cardiac arrest under anesthesia do not normally occur in the absence of negligence. Dr. Weinberger's testimony, rather, states that this *particular* patient, under these *specific* circumstances died because of *specific* negligence by Nurse Patterson which he was able to *specifically* identify through his interpretation of the ABG study (said interpretation, again, being rebutted at length by Dr. Bell). As to the *inherent* risk of sudden death while under anesthesia, Dr. Weinberger said very little other than to state his belief that Ms. Magette had no "*increased* risk" above normal for a patient undergoing anesthesia (N.T., September 15, 1999, p. 51, emphasis added). . . . Dr. Bell, [appellee's witness] on the other hand, testified directly, unrebutted by plaintiff, that sudden cardiac arrest is a recognized risk which can happen to anyone under anesthesia (N.T., September 21, 1999, p. 149). To the same effect, see [appellee's witness] Dr. Goodman's testimony (N.T., September 17, 1999, p. 113).

Trial Court Opinion, 6/7/00, at 9–10. Cardiac arrest, and subsequent death, are medically recognized risks during anesthesia. *See* N.T., 9/21/99, at 149. These risks are inherent with the use of anesthesia, and can occur in the absence of negligence. *See id.; see also* N.T., 9/17/99, at 113. Clearly, the evidence presented at trial showed sudden death while under anesthesia may ordinarily occur in the absence of negligence. Therefore, appellant failed to demonstrate the first requirement under the Restatement that "the event is of a kind which ordinarily does not occur in the absence of negligence." Restatement (Second) of Torts § 328 D(1)(a).

¶ 7 Appellant must also produce evidence that sufficiently eliminates other possible causes for Ms. Magette's death, other than appellee's negligence, to be entitled to the *res ipsa loquitur* charge. While the Restatement does not require appellant to disprove all other causes beyond a reasonable doubt, he must prove "that negligence is the more probable explanation." *Sedlitsky*, 582 A.2d at 1316. Appellant's evidence did not establish that appellee's negligence more likely than not caused Ms. Magette's death:

> Dr. Weinberger himself acknowledged that Ms. Magette's death could have resulted from causes other than inadequate oxygenation, but he testified to his belief that "we ruled out the three major catastrophes that could cause something like that in the autopsy." Dr. Weinberger identified these three major catastrophes as pulmonary embolus, air embolus, and myocardial infarction (N.T. September 15, 1999, p. 77, pp. 91–92). Even were Dr. Weinberger's testimony in this regard, standing alone, deemed sufficient to eliminate possible causes of Ms. Magette's death other than Nurse Patterson's negligence, this testimony was thoroughly rebutted by the defense with expert testimony which plaintiff

failed to challenge in any significant fashion.

Dr. Halbert E. Fillinger, Jr., the Coroner of Montgomery County, performed the autopsy upon Ms. Magette's body. At trial, Dr. Fillinger testified that Ms. Magette died from a sudden cardiac arrest. While he testified that he was unable to determine *why* Ms. Magette suffered the cardiac arrest, he also testified that this was not unusual (N.T., September 22, 1999, pp. 16–18). Dr. Fillinger further testified that there are "a lot of things that the heart will do to kill you" (N.T. September 22, 1999, p. 19), including electromechanical disassociation, and "any one of those things can produce a sudden death that is not identifiable at autopsy" (N.T., September 22, 1999, pp. 18–20).

\* \* \*

Dr. Bruce Goldman, a pathologist, testified as an expert for the defense. Dr. Goldman testified that his reading of Ms. Magette's autopsy report showed chronic abnormalities in Ms. Magette's lungs and liver which were, at a minimum, weeks old prior to her death. Dr. Goldman testified that these abnormalities were consistent with primary heart muscle disease and/or primary lung disease (N.T., September 21, 1999, pp. 90–92). Dr. Goldman further testified that a loss of blood pressure, followed by a loss of pulse and a lowering in oxygen saturation level (such as Ms. Magette suffered) were all consistent with a dysrhythmia or cardiac arrest related to primary heart muscle or lung disease (N.T., September 21, 1999, pp. 90–96, 98).

On cross-examination, plaintiff's attorney attempted to elicit testimony from Dr. Goldman confirming Dr. Weinberger's conclusions that the only likely

causes of Ms. Magette's cardiac arrest other than hypoxia were air embolism, pulmonary embolism, and myocardial infarction (N.T., September 21, 1999, pp. 98–105). Dr. Goldman failed to oblige counsel and testified that, while these three events would be "high on the list" of potential causes, they were not the *only* possible causes (N.T. September 21, 1999, p. 106). Of even greater importance is Dr. Goldman's testimony on redirect to the effect that the autopsy results did not eliminate as Dr. Weinberger believed they did myocardial infarction as a possible cause of Ms. Magette's death.

Trial Court Opinion, 6/7/00, at 10–12. As indicated by the testimony of the witnesses, appellant did not sufficiently eliminate other responsible causes of Ms. Magette's injury. *See id.; see also* Testimony of David A. Goodman, M.D., N.T. 9/21/99, at 49–55; Testimony of Bruce I. Goldman, M.D., *id.* at 114; Testimony of Steven D. Bell, M.D., *id.* at 149–57. Restatement § 328 D requires appellant to prove both that Ms. Magette's death would not ordinarily occur in the absence of negligence, and that other causes are sufficiently eliminated. *See* Restatement (Second) of Torts § 328 D; *see also Smith v. City of Chester,* 357 Pa.Super. 24, 515 A.2d 303, 305 (1986) ("It is well settled that all three of the elements set out in section 328 D(1) must be satisfied before an inference of negligence can be drawn from an injurious event."). Appellant has failed to meet either of these requirements; thus, the trial court properly withheld the *res ipsa loquitur* instruction.

 ¶ 8 Appellant next claims that the trial court erred by failing to charge

the jury with a permissive adverse inference instruction. We stated our standard of review in *Clark v. Philadelphia College of Osteopathic Medicine,* 693 A.2d 202, 204 (Pa.Super.1997) (citations omitted):

The decision whether to tell the jury an unfavorable inference may be drawn from the failure of a party to produce some circumstance, witness, or document is also one which lies within the sound discretion of the trial court and which will not be reversed absent manifest abuse.... The general rule is that[ ][w]here evidence which would properly be part of a case is within the control of the party in whose interest it would naturally be to produce it, and without satisfactory explanation he fails to do so, the jury may draw an inference that it would be unfavorable to him.

¶ 9 Appellant alleges that appellee discarded an EKG strip which would have been material to his case, and the jury should have been instructed with a missing evidence instruction. We agree and find that appellant made an adequate showing at trial that entitled him to such an instruction. First, Sheila Stieritz, the designated records custodian for appellee, testified the EKG strip was a medical record. *See* N.T. Sheila Stieritz, 9/14/99, at 22. She further testified that hospital policy is to retain medical records for a minimum of seven years following discharge. *See id.* at 21; *see also* Plaintiff's Exhibit 17, 9/14/99. Next, appellant demonstrated that the evidence would properly be part of the case through the testimony of Dr. Goodman. *See* N.T., 9/17/99, at 190–92. Dr. Goodman testified that he knew Ms. Magette's case was a coroner's case,[1] and that her cause of death was unknown, but he still inde-

---

1. A coroner's case is one where a coroner will investigate an unexplained death. The hospital's policy in coroner's cases is to retain all pertinent medical records surrounding the

death. *See* N.T. Suzanne Patterson, 9/14/99, at 59–60; *see also* N.T. Sheila Stieritz, 9/14/99, at 36–38.

pendently decided to throw away the EKG strip. *See id.* Dr. Goodman stated, "I left [the EKG strip] on the floor because it didn't show anything that I considered to be significant." *Id.* at 190. This rhythm strip is precisely the kind of evidence that Dr. Goodman would want to preserve in light of the fact that Ms. Magette had died of an unknown cause only moments earlier.

¶ 10 The trial court justified its ruling by claiming that appellant did not prove the EKG strip should have been retained. *See* Trial Court Opinion, 6/7/00, at 15–17. The trial court relied upon Ms. Stieritz's testimony that the clinicians decide whether to preserve the "rhythm strips," and on Dr. Goodman's testimony that the strips are not routinely preserved. N.T. Sheila Stieritz, 9/14/99, at 22; *see also* N.T. 9/17/99, at 192. This testimony, however, contradicts the hospital's policy to retain records for a minimum of seven years following discharge. *See* N.T. Sheila Stieritz, 9/14/99, at 21; *see also* Plaintiff's Exhibit 17, 9/14/99. The trial court also relied on Nurse Patterson's testimony that the heart monitor showed zero when she began running the EKG strip; therefore, the strip would not show any information and thus is not relevant to appellant's case. *See* Trial Court Opinion, 6/7/00, at 16–17. While the strip may have disproved appellant's theory, this determination should have been left to the jury, not to Dr. Goodman. Even if EKG strips are retained at the physician's discretion, we conclude that Dr. Goodman exercised poor judgment in discarding the strip, especially because the coroner determined Ms. Magette died of cardiac arrest. We find Dr. Goodman's explanation of why he did not retain the strip to be unsatisfactory in light of the circumstances of Ms. Magette's death and the hospital record retention policy. *See Clark,* 693 A.2d at 204–05 (affirming trial court's adverse inference instruction where this Court found expla-

nation for doctor's missing notes unsatisfactory). Thus, we find that the trial court erred in denying appellant's request for an adverse inference instruction.

¶ 11 Appellant's final claim is that the trial court erred by failing to give additional instructions to the jury's question regarding the EKG strip. Appellant is required by Pa.R.A.P. 2117(c) and 2119(e) to state in both the "Statement of the Case" and the "Argument" sections the specific portion of the record where the issue was preserved for appeal. Appellant's brief does not comply with these requirements. Further, upon review of the record, we find no objection by appellant to the trial court's response to the jury question. Appellant stated that he was satisfied with the judge's instruction. *See* N.T., 9/22/99, at 131–32. Under Pa. R.A.P. 302(a), "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." *See also Commonwealth v. Edmondson,* 553 Pa. 160, 718 A.2d 751, 753 (1998); *Commonwealth v. Dennis,* 548 Pa. 116, 695 A.2d 409, 411 (1997) ("[I]f appellate courts were to consider issues not raised in the trial court, then the trial would become a dress rehearsal ....") (citing *Dilliplaine v. Lehigh Valley Trust Company,* 457 Pa. 255, 322 A.2d 114, 116 (1974)); *Commonwealth v. Jones,* 248 Pa.Super. 214, 375 A.2d 63, 65–66 (1977) (holding that failure to object to trial court's refusal of further instruction to jury during deliberation results in waiver of issue on appeal). Because appellant did not preserve the issue at trial, this claim is waived.

¶ 12 Judgment reversed, case remanded for a new trial consistent with this opinion. Jurisdiction relinquished.