Joseph HANEY, Dec'd. and Betty Haney
Michael F. Haney, Kathleen M. Kras-
ley, Lisa A. Organiski, as Executors of
the Estate of Joseph Haney, Dec'd.,
Appellants,

v.

David N. PAGNANELLI,
M.D., Appellee.

Superior Court of Pennsylvania.

Argued April 22, 2003.

Filed July 14, 2003.

Reargument Denied Sept. 15, 2003.

Paul N. Minkoff, Philadelphia, for appel-
lants.

Marion H. Griffin, Philadelphia, for ap-
pellee.

Before: BENDER, MONTEMURO *, JJ and McEWEN, P.J.E.

MONTEMURO, J.

¶ 1 This is an appeal from the Order entered July 31, 2002, in the Montgomery County Court of Common Pleas granting summary judgment to Appellee/Defendant, David N. Pagnanelli, M.D., in this medical malpractice action. For the reasons set forth below, we reverse.

¶ 2 On May 10, 1995, Appellee performed a decompressive lumbar laminectomy at the L4–L5 nerve root level on Appellant/Plaintiff, Betty Haney, in an attempt to relieve her back and leg pain. Appellant had undergone a similar procedure in 1991 resulting in temporary relief. In his operative report, Appellee noted that he tore Appellant's dural membrane, which covers additional nerves and protects the spinal fluid, but that he repaired the tear without incident.

¶ 3 Within a few weeks after surgery, Appellant complained of urinary and stool incontinence and loss of sensation in her vaginal area resulting in sexual dysfunction. On May 1, 1997, Appellant filed this medical malpractice action[1] contending that Appellee negligently caused permanent damage to her sacral nerves at levels S2, S3, and S4, during the surgery. As Appellant's expert explained, these nerves are "in the same area as the L5 nerve root, and they're encased within the spinal dura compartment and bathed by the spinal fluid." (Defendant's *Frye* Motion, filed 4/19/02, Exhibit F, Videotape Deposition of Donald C. Austin, M.D. at 146).

¶ 4 On April 19, 2002, Appellee filed a *Frye*[2] Motion seeking preclusion of the testimony of Appellant's medical expert, Dr. Donald C. Austin, a neurological surgeon. Although the motion was originally granted by Order dated April 25, 2002, the court subsequently vacated that Order because it had neglected to give Appellant an opportunity to respond. *See* Order, dated 4/29/02. Following the submission of briefs by both parties, the trial court once again granted Appellee's *Frye* Motion by Order dated June 18, 2002. Appellee subsequently moved for summary judgment based on the preclusion of Dr. Austin's testimony and Appellant's resulting lack of expert testimony to support her medical malpractice action. By Order dated July 31, 2002, summary judgment was granted in favor of Appellee, and this timely appeal follows.

¶ 5 Appellant raises two issues for our review:

I. WHETHER THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION, OR AN ERROR OF LAW BY APPLYING A *FRYE* ANALYSIS TO THE OPINIONS OF APPELLANTS' EXPERT, WHEN THE EXPERT OPINIONS DO NOT RELY [ON] ANY NOVEL SCIENTIFIC THEORIES THAT PRODUCE NEW EVIDENCE.

II. WHETHER THE TRIAL COURT, ASSUMING THAT THE *FRYE* PRINCIPALS [sic] ARE APPLICABLE, COMMITTED AN ABUSE OF DISCRETION OR AN ERROR OF LAW BY PRE-CLUDING APPELLANT'S EX-

* Retired Justice assigned to Superior Court.

1. Although Abington Memorial Hospital was originally named as a defendant, it was voluntarily dismissed from the case by stipulation of the parties entered March 13, 2000.

2. *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923).

PERT MEDICAL OPINION RE-GARDING THE CAUSE OF THE APPELLANT, BETTY HANEY'S INJURY TO THE SACRAL NERVES (S2, 3, 4) FOLLOWING NERVE DECOMPRESSION AT THE L4–5 LEVEL, WHEN THE METHOD FOR DETERMINING THE CAUSE OF THE SACRAL NERVE INJURY IS RELIABLE AND SOUND.

(Appellant's Brief at 4).

¶ 6 Our standard for reviewing a trial court's grant of summary judgment is well-established: "we view the record in the light most favorable to the non-moving party and resolve all doubts as to the existence of a genuine issue of material fact in its favor." *Juniata Valley Bank v. Martin Oil Co.*, 736 A.2d 650, 655 (Pa.Super.1999).

> [A] non-moving party must adduce sufficient evidence on an issue essential to [her] case and on which [she] bears the burden of proof such that a jury could return a verdict in [her] favor. Failure to adduce this evidence establishes that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

*Checchio v. Frankford Hospital–Torresdale Div.*, 717 A.2d 1058, 1059 (Pa.Super.1998), *appeal denied*, 566 Pa. 633, 781 A.2d 137 (2001) (quoting *Ertel v. Patriot–News Co.*, 544 Pa. 93, 674 A.2d 1038, 1042 (1996), *cert denied*, 519 U.S. 1008, 117 S.Ct. 512, 136 L.Ed.2d 401 (1996)).

∎ ¶ 7 Here, the trial court entered summary judgment after Appellant's medical expert testimony was precluded. *See Mitzelfelt v. Kamrin*, 526 Pa. 54, 584 A.2d 888, 892 (1990) ("A plaintiff [in a medical malpractice action] is ... required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered.").[3] Appellant's issues on appeal, therefore, challenge the court's preclusion of her expert testimony.

∎ ¶ 8 In her first issue, Appellant contends that the trial court misapplied the *Frye* rule because the rule pertains only to "novel" scientific evidence. Here, Appellant argues that her expert, Dr. Austin, used simple deductive reasoning to opine that Appellee must have injured Appellant's sacral nerves during the May 10th surgery, and that in doing so, Appellee acted negligently. Because we agree that the *Frye* rule is inapplicable to the proposed expert testimony here, we reverse.

¶ 9 In the seminal case *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (Cir. 1923), the Circuit Court for the District of Columbia considered whether a trial court erred in precluding expert testimony regarding a systolic blood pressure deception test performed on the defendant, which the defendant claimed could determine whether a subject was telling the truth based on changes in the subject's blood

---

**3.** We note that an exception to this general rule can be found in medical malpractice actions based on the doctrine of *res ipsa loquitur*, that is, " 'where the matter is so simple or the lack of skill or care so obvious as to be within the range of experience and comprehension of even lay persons.' " *Grandelli v. Methodist Hosp.*, 777 A.2d 1138, 1146 (Pa.Super.2001) (quoting *Hightower–Warren*

*v. Silk, M.D.*, 548 Pa. 459, 698 A.2d 52, 52 n. 1 (1997)). There was some discussion of application of the doctrine to the facts *sub judice* during oral argument on the summary judgment motion, and, indeed, Appellee's counsel indicated to the court that Dr. Austin's "whole opinion was res ipsa, so to speak." (N.T. Oral Argument, 7/10/02, at 22). However, Appellant has not pursued a *res ipsa* claim.

pressure.[4] *Id.* at 1013–14. The Circuit Court upheld the trial court's ruling, finding that the test had not yet gained such general acceptance by relevant authorities as to warrant admission of expert testimony on the subject.

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony from a well-recognized scientific principle or discovery, **the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.**

*Id.* at 1014 (emphasis added).

¶ 10 In *Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277 (1977), the Pennsylvania Supreme Court adopted the *Frye* rule, holding that the "[a]dmissiblity of the evidence depends upon the general acceptance of its validity by those scientists active in the field to which the evidence belongs[.]" *Id.* at 1281. In *Topa,* the Court concluded that *Frye* precluded expert testimony concerning sound spectograph and voiceprint analysis.

¶ 11 Since that time, the courts of this Commonwealth have applied the *Frye* rule in numerous cases to determine whether scientific evidence has gained general acceptance in the relevant scientific community prior to its submission to a jury. *See Blum v. Merrell Dow Pharmaceuticals, Inc.,* 564 Pa. 3, 764 A.2d 1 (2000) (precluding expert testimony that infant's clubbed feet resulted from ingestion of drug Bendectin by mother during fetal gestation); *Commonwealth v. Blasioli,* 552 Pa. 149, 713 A.2d 1117 (1998) (admitting expert testimony concerning statistical probabilities of DNA match calculated using product rule); *Commonwealth v. Crews,* 536 Pa. 508, 640 A.2d 395 (1994) (admitting expert testimony concerning DNA evidence, but precluding testimony concerning statistical analysis of evidence); *Trach v. Fellin,* 817 A.2d 1102 (Pa.Super.2003) (*en banc*)[5] (admitting expert testimony that massive overdose of drug Doxepin caused plaintiff's chronic open-ended glaucoma); *Grady v. Frito–Lay, Inc.,* 789 A.2d 735 (Pa.Super.2001) (*en banc*), *appeal granted,* 569 Pa. 46, 800 A.2d 294 (2002)[6] (admitting expert testimony that plaintiff's ingestion of Doritos corn chips caused esophageal tear); *Thomas v. West Bend Co.,* 760 A.2d 1174 (Pa.Super.2000), *appeal denied,* 566 Pa. 647, 781 A.2d 147 (2001) (precluding expert testimony that plaintiff's low voltage shock from defendant's popcorn popper caused plaintiff's cardiomyopathy); *Checchio, supra* (precluding expert testimony that infant's oxygen deprivation within 12 hours after birth caused autism).

¶ 12 However, despite the wealth of recent caselaw on the subject, application of the *Frye* rule has remained somewhat misunderstood. Indeed, on at least two occa-

---

4. We note that the United States Supreme Court renounced the *Frye* rule in its 1993 decision, *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), holding that *Frye* had been superceded by the Federal Rules of Evidence. To date, the Pennsylvania Supreme Court has not abandoned the *Frye* rule in favor of a *Daubert* analysis.

5. A petition for allowance of appeal was filed in the Supreme Court on March 13, 2003.

6. The *Grady* case was argued before the Supreme Court on March 4, 2003. When it granted allowance of appeal, the Court asked the parties to address the admissibility of the proposed evidence under both *Frye* and *Daubert.*

sions, a panel of this Court has stated that *Frye* applies "whenever science enters the courtroom," *Blum, supra* at 1317; *see also Thomas, supra* at 1179. In *Thomas,* we considered the same issue raised *sub judice,* that is, whether the *Frye* rule applies when expert testimony is not the product of a **new** scientific invention or technique. *Thomas, supra* at 1178. Citing the language from this Court's opinion in *Blum,* we concluded that the "trial court properly applied *Frye* because 'science' entered 'the courtroom.'" *Id.* at 1179. However, a close reading of *Thomas* reveals that we may not have intended such an expansive application of the rule. Indeed, we noted that "our courts have often applied *Frye* to situations where experts use traditional techniques to announce a **new** syndrome or theory of causation." *Id.* at 1178 (emphasis added).

¶ 13 In the very recent decision, *Trach v. Fellin, supra,* an *en banc* panel of this Court held definitively that "*Frye* only applies when a party seeks to introduce **novel** scientific evidence." *Trach, supra* at 1109 (emphasis in original). As we noted, "[c]learly, our supreme court did not intend that trial courts be required to apply the *Frye* standard every time scientific experts are called to render an opinion at trial, a result that is nothing short of Kafkaesque to contemplate." *Id.* at 1110. Although this may seem to be a departure from this Court's language in *Blum* and *Thomas,* we find that a broad reading of that language may have been unsound. In both of those cases, the challenged scientific evidence was indeed **novel**. *See Thomas, supra* (no studies proving low voltage electric shock can cause cardiomyopathy); *Blum, supra* (no studies indicating ingestion of drug Bendectin during fetal gestation can cause birth defects, or specifically, clubbed feet).

¶ 14 Conversely, in the present case, Dr. Austin's expert testimony does not involve "novel scientific evidence." The substance of his opinion is as follows: Appellee admitted that, during surgery on May 10, 1995, he entered the dural compartment where the affected nerves are located; there was no other demonstrable cause for Appellant's nerve damage which manifested itself for the first time after the surgery; therefore, Appellee must have injured Appellant's nerves during the surgery. Further, Dr. Austin opined that this type of complication would not occur absent negligence. This testimony does not implicate a *Frye* analysis.

▪ ¶ 15 As we stated in *Trach, supra,* "*Frye's* general acceptance standard requires only that the scientific community generally accept the principles from which the scientist is proceeding and the methodology the scientist is employing to reach his or her conclusions." *Trach, supra* at 1114. Here, there is nothing novel about the principles or methodology Dr. Austin utilized to reach his conclusion. He simply used the process of elimination to rule out all other possible causes of Appellant's injury, and to conclude that her nerves must have been damaged during the surgery. Moreover, he attributed this to Appellee's negligence.

¶ 16 Appellee's expert, Dr. Warren Goldman, Chairman of the Department of Neurosurgery at MCP Hahnemann University, opined that Appellant's complaints are "known complications of a properly executed surgery ... [that do] not require a misadventure or negligent performance of an operation." (Defendant's Supplemental Memoranda in Support of *Frye* Motion, filed 5/16/02, Videotape of H. Warren Goldman, M.D. at 81). Indeed, he testified that an injury to the sacral nerves could have occurred during surgery whether or not

Appellee exercised due care. (*Id.* at 139–40).

¶ 17 Therefore, there is nothing novel about the principles or methodology Dr. Austin relied upon to reach his conclusion, or indeed, about that conclusion itself. In fact, Appellee's expert agrees that an injury **could** have occurred as a result of negligence. Appellee simply challenges the evidence supporting Dr. Austin's opinion, that is, he contends that there is absolutely no proof that Appellee, here, injured the sacral nerves during surgery. This argument, however, is a basis for cross-examination, not preclusion of the testimony under *Frye*.

■ ¶ 18 Moreover, we do not agree that the disciplinary action brought against Dr. Austin by the American Association of Neurological Surgeons (AANS) supports preclusion of his testimony under the *Frye* rule; rather it is relevant only to challenge Dr. Austin's credibility as an expert. In that action, affirmed by the United States Court of Appeals for the Seventh Circuit, AANS sanctioned Dr. Austin for what it considered to be irresponsible expert testimony in another medical malpractice case. Although the case involved a different medical procedure, Appellee contends, and Dr. Austin agreed, that the premise of his opinion in the former case was the same as here, that is, because a patient suffered an injury following surgery that was not present prior to surgery and the patient exhibited no anatomical abnormality, the injury must have occurred as a result of the surgeon's negligence.

¶ 19 However, even a cursory review of AANS' Professional Conduct Committee's Report reveals striking differences between Dr. Austin's opinion here and in the former case. Apparently, in the former case Dr. Austin opined, without any sup-port in "literature or logic," that the permanence of the plaintiff's nerve injury "establishes surgical negligence as its cause." (Defendant's *Frye* Motion, filed 4/19/02, Exhibit C, Report of the Professional Conduct Committee of the American Association of Neurological Surgeons at 5). Moreover, he asserted that a majority of neurosurgeons would agree with his conclusion, a declaration that AANS' Professional Conduct Committee found to be "entirely false." (*Id.*).

¶ 20 Here, Dr. Austin's opinion is considerably more restrained. Although he begins with a logical and acceptable premise, *i.e.*, that since Appellee admitted he entered the dural compartment during surgery, he **could have** injured the sacral nerves encased therein, he fails to support this premise with any concrete facts. Moreover, unlike in the former case, here Dr. Austin declines to assign fault to Appellee solely on the basis of the permanence of Appellant's injury, and does not proclaim that his opinion is held by a majority of neurosurgeons.[7] Although we recognize that the disciplinary action involved Dr. Austin's expert testimony in a medical malpractice case which bordered on a *res ipsa* claim, as does his testimony here, we remind Appellee that it was, indeed, a disciplinary action by a professional organization, not preclusion of testimony by a trial court applying the *Frye* rule. Therefore, its only function in the case *sub judice* would be to undermine Dr. Austin's credibility as an expert.

¶ 21 Accordingly, because we conclude that the trial court misapplied the *Frye* rule in the present case, and erroneously precluded the testimony of Appellant's expert at trial, we reverse the July 31, 2002, Order granting Appellee's motion for sum-

---

7. Indeed, he appears to have learned from his past transgressions.

mary judgment, and remand for proceedings consistent with this Opinion.[8]

¶ 22 Order reversed; case remanded for proceedings consistent with this Opinion; jurisdiction relinquished.

¶ 23 BENDER, J. files a dissenting opinion.

## DISSENTING OPINION BY BENDER, J.:

¶ 1 I agree with the majority's conclusion that *Frye* is inapplicable in this case, especially in light of our Court's recent decision in *Trach v. Fellin*, 817 A.2d 1102 (Pa.Super.2003), which limits the application of *Frye* to novel scientific evidence. However, I write separately because there are sound and compelling reasons upon which to exclude Dr. Austin's expert opinion and, consequently, affirm the trial court's grant of summary judgment in favor of Appellee.[9]

¶ 2 Summary judgment is properly granted where the evidentiary record contains insufficient evidence to establish a *prima facie* case and where, consequently, there is no issue to be submitted to the jury. *Grandelli v. Methodist Hosp.*, 777 A.2d 1138, 1143 (Pa.Super.2001) (citing Pa. R.C.P. 1035.2(2)). When summary judgment is granted on this basis, and the non-moving party fails to proffer evidence essential to preserve its cause of action, the moving party is entitled to judgment as a matter of law. *Id.* at 1143–44. On appellate review of a grant of summary judgment, we are not bound by the trial court's conclusions of law, rather we may reach our own conclusions. *Id.* at 1144. However, we will not disturb the trial court's

decision absent an error of law or abuse of discretion. *Id.* Our scope of review is plenary. *Id.*

¶ 3 The trial court granted Appellee's motion for summary judgment after excluding Dr. Austin's expert testimony. As with the grant of summary judgment, "[t]he admissibility of evidence is a matter addressed to the sound discretion of the trial court and should not be overturned absent an abuse of discretion." *Education Res. Inst., Inc. v. Cole*, 827 A.2d 493, 499 (Pa.Super.2003). Accordingly, my focus in this dissent is on the serious deficiencies in Dr. Austin's expert report and testimony, which lead me to conclude that the trial court did not abuse its discretion by excluding his opinion. Indeed, despite the inapplicability of *Frye*, an expert whose opinion is speculative and unsupported by the facts should not have the opportunity to present such opinion to a jury who, because of the expert's purported status in his field, may tend to impart credence to the expert's words.

¶ 4 First, I will address the *res ipsa loquitur* issue, upon which Appellant's entire case is premised. Initially, I conclude that Appellant failed to present sufficient evidence to sustain a cause of action even based on *res ipsa* and, therefore, the trial court did not err by granting summary judgment in Appellee's favor pursuant to Pa.R.C.P. 1035.2(2).

¶ 5 In note 3 of its opinion, the majority indicates that, at oral argument on the summary judgment motion, the parties discussed the application of *res ipsa loquitur* in the instant case and Appellee noted that Dr. Austin's "whole opinion was *res*

---

8. Because of our disposition of this issue, we need not address Appellant's second claim on appeal.

9. "It is well settled that where the result is correct, an appellate court may affirm a lower

court's decision on any ground without regard to the ground relied upon by the lower court itself." *Boyer v. Walker*, 714 A.2d 458, 463 n. 10 (Pa.Super.1998) (affirming trial court order granting summary judgment).

*ipsa,* so to speak." Majority Opinion at n. 3 (citing N.T. Oral Argument, 7/10/02, at 22). The majority then dismisses the *res ipsa* issue by stating that "Appellant has not pursued a *res ipsa* claim." *Id.* at n. 3. Similarly, on page 983 of its opinion, the majority indicates that the disciplinary action taken against Dr. Austin by the American Association of Neurological Surgeons (AANS) involved a medical malpractice case that "bordered on a *res ipsa* claim, as does his testimony here." *Id.* at 983.

¶ 6 I respectfully disagree with the majority's characterization of *res ipsa* as a "claim." "*Res ipsa loquitur* is neither a doctrine of substantive law nor a theory of recovery; rather, it is a rule of circumstantial evidence." *Toogood v. Rogal,* 573 Pa. 245, 824 A.2d 1140, 1146 (2003). Appellant's case is, in fact, based entirely on *res ipsa,* as there is no direct evidence of negligence and Dr. Austin's opinion, as further described below, proceeds on the assumption that Appellee must have been negligent in performance of the surgery merely because there is, in his opinion, no other explanation for Appellant's symptoms.

¶ 7 Our Supreme Court recently revisited the *res ipsa* doctrine vis-à-vis medical malpractice litigation in *Toogood.* As noted in *Toogood,* a medical malpractice plaintiff must "establish a duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of the harm." *Id.* at 1145 (quoting *Hightower–Warren v. Silk,* 548 Pa. 459, 698 A.2d 52, 54 (1997)). In a medical malpractice case, the alleged negligence of the physician "encompasses matters not within the ordinary knowledge and experience of laypersons," so the plaintiff must "present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury." *Id.* In other words, the plaintiff must present expert testimony to "establish that the care and treatment of the plaintiff by the defendant fell short of the required standard of care and that the breach proximately caused the plaintiff's injury." *Id. See also Checchio v. Frankford Hosp.,* 717 A.2d 1058, 1060 (Pa.Super.1998) ("Where the alleged negligence is medical in nature, the plaintiff must present evidence from an expert 'who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered.'" (citation omitted)).

¶ 8 The narrow exception to the expert testimony requirement is conceptualized as the doctrine of *res ipsa* in which "the matter is so simple or the lack of skill or care so obvious as to be within the range of experience and comprehension of even non-professional persons." *Id.* (quoting *Hightower–Warren,* 698 A.2d at 54 n. 1). As further defined in *Toogood:*

> The doctrine of *res ipsa loquitur* allows plaintiffs, without direct evidence of the elements of negligence, to present their case to the jury based on an inference of negligence. The key to the doctrine is that a sufficient fund of common knowledge exists within a jury of laypersons to justify raising the inference. Instead of directly proving the elements of ordinary negligence, the plaintiff provides evidence of facts and circumstances surrounding his injury that make the inference of the defendant's negligence reasonable. "The gist of res ipsa loquitur ... is the inference, or process of reasoning by which the conclusion is reached. This must be based upon the evidence given, together with a sufficient background of human experi-

ence to justify the conclusion. It is not enough that plaintiff's counsel can suggest a possibility of negligence." Prosser & Keeton, *The Law of Torts* § 39, p. 243 (5th ed.1995). This theory relieves the plaintiff of having to prove causation directly.

*Toogood* at 1146. However, the doctrine of *res ipsa* may be applied even in cases where the plaintiff presents an expert, but still requires the inference of negligence to make her case. In *Jones v. Harrisburg Polyclinic Hosp.*, 496 Pa. 465, 437 A.2d 1134 (1981), our Supreme Court stated that there are "two avenues to avoid the production of direct medical evidence of the facts establishing liability." *Toogood* at 1148 (quoting *Jones*, 437 A.2d at 1138). First, as described above, the plaintiff may rely on "*common lay knowledge* that the event would not have occurred without negligence." *Id.* (quoting *Jones*, 437 A.2d at 1138). In such instances, a conclusion may be drawn based on general knowledge of the layperson, similar to instances where a court takes judicial notice of a fact. *Id.* (citing RESTATEMENT OF TORTS (SECOND), § 328D, cmt. d (1965)). Second, the plaintiff may rely on expert medical knowledge that an event usually does not occur without negligence in cases where there is no fund of common knowledge which may permit laymen reasonably to draw the conclusion. *Id.*

¶ 9 In *Toogood*, our Supreme Court emphasized the critical role of expert testimony in establishing the elements of negligence in medical malpractice cases, thereby limiting the application of *res ipsa* in such cases. *See id.* at 1149. The Court stated, *inter alia*, that "to say whether a particular error on the part of a physician reflects negligence demands a complete understanding of the procedure the doctor is performing and the responsibilities upon him at the moment of injury." *Id.* at

1149. The Court further stated that "[t]he cause and effect of a physical condition lies in a field of knowledge in which only a medical expert can give a competent opinion.... [Without experts] we feel that the jury could have no basis other than conjecture, surmise or speculation upon which to consider causation." *Id.* (quoting *Woods v. Brumlop*, 71 N.M. 221, 377 P.2d 520, 523 (1962)).

¶ 10 After providing a detailed explanation of *res ipsa* and concluding that its application must be limited in medical malpractice cases, our Supreme Court refined the traditional three-prong test that must be met before a plaintiff may invoke *res ipsa* in a medical malpractice case:

(a) either a lay person is able to determine as a matter of common knowledge, or an expert testifies, that the result which has occurred does not ordinarily occur in the absence of negligence; (b) the agent or instrumentality causing the harm was within the exclusive control of the defendant; and (c) the evidence offered is sufficient to remove the causation question from the realm of conjecture, but not so substantial that it provides a full and complete explanation of the event. It is only when each of the three conditions is satisfied that an inference of negligence can be drawn from the occurrence of an injurious event.

*Id.* at 1150 (sometimes hereinafter referred to as "*Toogood* test"). Prong (c) of the *Toogood* test is similar to the second prong of the traditional *res ipsa* test set forth in section 328D(1)(b) of the Restatement (Second) of Torts, which states that an inference of negligence is established when, *inter alia*, "other responsible causes, including the conduct of the plaintiff and third persons, are *sufficiently eliminated* by the evidence." [10] *See Gran-*

---

**10.** The first prong of the *res ipsa* test in the    Restatement is "the event is of a kind which

*delli*, 777 A.2d at 1147 (emphasis added). In my view, and as I describe more fully below, Dr. Austin's opinion fails to remove the question of causation from the realm of conjecture, and thereby fails to meet the requirement of prong (c) of the *Toogood* test or the second prong of the traditional *res ipsa* test.

¶ 11 Of course, a plaintiff in a medical malpractice case need not disprove all other causes of the injury beyond a reasonable doubt; however, the plaintiff must prove that the alleged negligence is the more probable explanation for the injury. *Magette v. Goodman*, 771 A.2d 775, 779 (Pa.Super.2001). In *Magette*, we concluded that the plaintiff (who was the administrator of the decedent's estate) failed to establish the second prong of the traditional *res ipsa* test such that the issue of *res ipsa*, *i.e.*, the inference of negligence in the absence of direct evidence, could be submitted to the jury. Specifically, the decedent suffered cardiac arrest and death while under general anesthesia during back surgery. We agreed with the trial court that the plaintiff's expert's testimony did not sufficiently eliminate possible causes of the decedent's death other than the defendant's negligence (*i.e.*, the evidence did not establish that the defendant's negligence more likely than not caused the decedent's death) even though the expert testified that, based on the autopsy results, he ruled out three other reasons that could have caused the decedent's death, specifically, pulmonary embolism, air embolism, and myocardial infarction. *Id.* We further recognized that the defendant's evidence "thoroughly rebutted" the plaintiff's expert's testimony and that the plaintiff failed to challenge the defendant's rebuttal evidence in any significant fashion. *Id.* In all, we concluded that the plaintiff's expert's testimony failed to sufficiently eliminate other possible causes of the decedent's death.

¶ 12 In the instant case, although Dr. Austin testified that the symptoms Appellant complained of after surgery do not occur absent negligence, *see* Deposition of Donald C. Austin, MD, 4/16/02, at 189 (hereinafter Dr. Austin's Deposition), he failed to sufficiently eliminate other possible causes of Appellant's complaints and thereby failed to remove the question of causation from the realm of speculation and conjecture.

¶ 13 Dr. Austin's opinion is premised on the fallacious logic of *post hoc ergo propter hoc*, which translates from Latin into "after this, therefore because of this." BLACK'S LAW DICTIONARY 1186 (7th ed.1999). *Post hoc* describes "the fallacy of assuming causality from temporal sequence; confusing sequence with consequence." *Id.* Dr. Austin's opinion boils down to the bald conclusion that, merely because Appellant had certain alleged injuries approximately two weeks after the surgery performed by Appellee, such alleged injuries must have been caused by Appellee's negligent performance of the surgery. Consider the following excerpt from Dr. Austin's deposition testimony:

> [Appellee's attorney]: ... Now, if I understand what you've told us in your direct testimony, you've concluded that because Mrs. Haney suffered a nerve injury sometime subsequent—being reported sometime subsequent to the operation that [Appellee] performed, that the surgery must have been performed negligently—

ordinarily does not occur in the absence of negligence," and the third prong is "the indicated negligence is within the scope of the defendant's duty to the plaintiff." RESTATEMENT OF TORTS (SECOND) § 328D(1)(a) & (c) (1965). These mirror prongs (a) and (b), respectively, of the *Toogood* test.

[Dr. Austin]: Yes.

[Appellee's attorney]:—isn't that your conclusion?

[Dr. Austin]: Yes, it is.

Dr. Austin's Deposition at 169. This is a striking example of Dr. Austin's reliance on faulty logic. Moreover, although Dr. Austin purported to eliminate all other causes of Appellant's alleged injury, he fails to indicate or describe even in the slightest degree in his report what other potential causes he explored and eliminated. *See Magette,* 771 A.2d at 779. Accordingly, Appellant has failed to present evidence sufficient to remove the question of causation from the realm of conjecture or, in other words, Appellant has failed to present evidence that sufficiently eliminates other responsible causes of her alleged injuries. *See Toogood* at 1150; *Grandelli,* 777 A.2d at 1147; RESTATEMENT OF TORTS (SECOND) § 328D(1)(b) (1965). For these reasons, Appellant cannot properly invoke *res ipsa* to create the inference of negligence and, in turn, she cannot establish a *prima facie* case of negligence against Appellee. Summary judgment on this basis is, therefore, appropriate.

¶ 14 Dr. Austin's proffered opinion is troubling also because it is based on facts not warranted by the record but is, rather, based on mere assumptions. It is well settled that "an expert cannot base an opinion on facts which are not warranted by the record." *Kelly v. St. Mary Hosp.,* 778 A.2d 1224, 1227 (Pa.Super.2001) (concluding trial court properly prevented plaintiff's expert from testifying about facts outside the record). Furthermore, "[n]o matter how skilled or experienced the [expert] witness may be, he will not be permitted to guess or to state a judgment based on mere conjecture." *Kovach v. Central Trucking, Inc.,* 808 A.2d 958, 959 (Pa.Super.2002) (citation omitted).

¶ 15 Appellant asserts throughout her brief that Appellee deviated from the standard of care by "cutting the dura **and associated structures** during surgery and, in the process, 'impacted' the S2, S3 and S4 nerve[s]." Appellant's brief at 6 (emphasis added). More specifically, Appellant asserts that Appellee tore the dura and *"passed the arachnoid sheath"* thereby causing injury to the sacral nerves. *See, e.g., id.* at 7, 9 (emphasis added). Appellee indicated in his post operative note that the dura was torn during the surgery and repaired without incident. Indeed, Dr. Austin admitted that the tearing of the dura is a common occurrence, especially if the site had been subject to previous surgery, as in this case. However, there was *no* indication in the operative note or otherwise, that Appellee tore, cut, or "passed through" the arachnoid sheath. Dr. Austin admitted that Appellee's operative note did not indicate such an injury, but for purposes of his expert opinion, he assumed that Appellee did "pass through" the arachnoid sheath. The following excerpts from Dr. Austin's deposition are illustrative:

[Appellee's attorney]: Doctor, would you agree with me that the primary closure of a dural tear is the most ideal way to repair it?

[Dr. Austin]: Yes.

* * *

[Appellee's attorney]: And would you agree with me, sir, that in addition to the dura surrounding the nerves as they run out below the spinal cord, there's also a sheath called the arachnoid sheath?

[Dr. Austin]: Yes.

[Appellee's attorney]: And [Appellee] doesn't indicate in his operative note that he's cut the arachnoid sheath, did he?

* * *

[Dr. Austin]: He doesn't describe anything. That's the problem.

[Appellee's attorney]: Well, he does describe, sir, that he cut the dura; correct?

[Dr. Austin]: Right.

[Appellee's attorney]: He does not say that he cut the arachnoid sheath, did he?

[Dr. Austin]: No he didn't say that.

[Appellee's attorney]: Okay. And in order for there to be leakage of spinal fluid *and in order for there to have been damage by [Appellee] to the nerves directly from him cutting down, as you said, with these instruments, he would have had to have gone through the arachnoid sheath* as well, would he have not?

[Dr. Austin]: *Yes, but we don't know that he didn't.*

Dr. Austin's Deposition at 181–182 (emphasis added). Consider also the following excerpt:

[Appellee's attorney]: So I just want to make sure that I understand your opinions in this case. And I think I understand them to be that because there was no other evidence of a cause of Mrs. Haney's complaints, it had to have been as a result of the surgery [Appellee] performed?

[Dr. Austin]: Yes.

[Appellee's attorney]: And that as a result of that, you suspect, although it's not in his operative note, that he went beyond tearing the dura, passed the arachnoid sheath and injured the nerves?

[Dr. Austin]: Yes. There's absolutely no other other [sic] explanation.

*Id.* at 193.

¶ 16 Dr. Austin admitted that he had no direct evidence to believe that Appellee would try to hide the fact that he cut the arachnoid sheath, if he did indeed do so. *Id.* at 183. Nevertheless, it is clear that Dr. Austin's opinion relied on the assumption that Appellee "passed through the arachnoid sheath"—a "fact" that is wholly unsupported by the record. *See Kelly,* 778 A.2d at 1227. The trial court properly excluded Dr. Austin's opinion on this basis. *See id.*[11]

¶ 17 Also of particular concern is Dr. Austin's admission that his opinion in the instant case is based on the same premise he used to formulate an opinion in an Illinois case in which he testified as a plaintiff's expert, *Patricia Ayers, et al. v. Michael Ditmore, M.D.,* and for which he was subsequently disciplined by the American Association of Neurological Surgeons (AANS). Patricia Ayers, the plaintiff therein, suffered permanent laryngeal nerve injury after Dr. Ditmore performed surgery on the cervical, or neck, area of her spine. In that case, Dr. Austin opined that Dr. Ditmore must have been negligent in performing the cervical surgery because Ms. Ayers's subsequent laryngeal nerve injury was permanent. *See* Report of the Professional Conduct Committee of the American Association of Neurological Surgeons [AANS Report], 10/15/95, at 3, 5. He further opined that Dr. Ditmore must have "rushed" the surgery, although there was no evidence to support this assumption. *See Austin v. American Assoc. of Neurological Surgeons,* 253 F.3d 967, 970 (7th Cir.2001). The jury returned a verdict for Dr. Ditmore. *Id.*

---

11. The majority admits that Dr. Austin's opinion is not supported by the facts of record.

*See* Majority Opinion at 983.

¶ 18 Dr. Ditmore subsequently brought a disciplinary action against Dr. Austin before the AANS. The AANS disciplinary committee concluded that there was "no convincing basis in either literature or logic for [Dr. Austin's] testimony that permanence of a recurrent laryngeal nerve injury establishes surgical negligence as its cause." AANS Report at 5. Dr. Austin received a six month suspension from the AANS as a result of his testimony, which the disciplinary committee described as "particularly egregious." *Id.*

¶ 19 Dr. Austin sued the AANS, claiming their suspension was retaliatory, violated his due process rights, and resulted in a decrease in his expert-witness income. *See Austin,* 253 F.3d at 968. After the federal district court granted summary judgment in favor of the AANS, Dr. Austin appealed to the United States Court of Appeals for the Seventh Circuit. In an opinion written by the Honorable Richard Posner, the Seventh Circuit affirmed the trial court's grant of summary judgment. *See id.* The Court noted that the AANS rejected Dr. Austin's opinion in the *Ayers* case as the view of the majority of neurosurgeons in the country. *See id.* at 971. The Court further found no basis in literature for Dr. Austin's "unorthodox" and "irresponsible" opinion and indicated that his opinion, if accepted, would make "the surgeon an insurer against any serious mishaps in an anterior cervical fusion, [and] make the operation exceptionally risky in a financial or liability sense for the surgeon." *Id.* Judge Posner wrote:

> By becoming a member of the prestigious [AANS] ... Austin boosted his credibility as an expert witness. The Association had an interest—the community at large had an interest—in Austin's not being able to use his membership to dazzle judges and juries and deflect the close and skeptical scrutiny that shoddy testimony deserves. It is

no answer that judges can be trusted to keep out such testimony. Judges are not experts in any field except law.... Judges need the help of professional associations in screening experts.

*Id.* at 972–73. Judge Posner opined that, if Dr. Austin's "testimony [in the *Ayers* ] trial was a type of medical service and if the quality of his testimony reflected the quality of his medical judgment, he is probably a poor physician." *Id.* at 974.

¶ 20 Judge Posner recognized that the federal courts employ *Daubert* to screen proposed expert witnesses to ensure that their testimony is reliable, but noted that only federal courts are bound by *Daubert. Id.* at 973. Indeed, Pennsylvania has not officially adopted the *Daubert* standards of admissibility and now, with the decision in *Trach* enunciating the limited applicability of *Frye,* trial courts are left with little guidance in determining the reliability and, hence, admissibility of expert testimony.

¶ 21 Nevertheless, despite the inapplicability of *Frye* in the instant case, we must preserve the trial court's broad discretion in determining whether to admit or exclude expert testimony. In addition to the reasons stated above with regard to why the trial court did not err in excluding Dr. Austin's testimony, I further note that Dr. Austin expressly admitted, in his deposition, that he relied on the same premise in reaching his opinion in the instant case as he used in reaching his opinion in the *Ayers* case—an opinion that was harshly criticized by his peers and the federal courts. Specifically, he testified as follows:

> [Appellee's attorney]: In [the *Ayers* ] case ... your opinion was that when the patient underwent cervical surgery to the cervical area of her spine, she suffered a permanent laryngeal nerve injury; correct?

> [Dr. Austin]: Yes, I did.

[Appellee's attorney]: And you testified that she suffered a permanent laryngeal nerve injury so, therefore, the surgery that was performed must have been performed negligently?

[Dr. Austin]: Yes.

[Appellee's attorney]: Isn't that the same basis or the same premise for your opinion here today? Different levels of the spine, but same premise?

[Dr. Austin]: Yes, the same premise. Dr. Austin's Deposition at 195. Dr. Austin employed the same faulty *post hoc ergo propter hoc* logic in the *Ayers* case as he is employing in the instant case.

¶ 22 In sum, the unreliability and insufficiency of Dr. Austin's opinion necessary to invoke *res ipsa* transcends the inapplicability of *Frye*. A myriad of reasons exist upon which the trial court properly precluded Dr. Austin's testimony. Essentially, there is no factual basis for Dr. Austin's opinion, which, if admitted, would only have the effect of making Appellee a guarantor of perfect health. Dr. Austin's expert opinion provides "no basis other than conjecture, surmise or speculation upon which to consider causation." *See Toogood* at 1149 (quoting *Woods*, 377 P.2d at 523). If we permitted such irresponsible testimony, "few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.' " *Id.* at 1151 (citation omitted). Even where *Frye* is inapplicable because no novel scientific evidence is proffered by the proposed expert, the trial court still must retain its broad discretion regarding the admissibility of evidence, and the trial court must be able to exclude expert opinions that are unreliable, speculative, and/or unsound and that fail to meet the same level of intellectual rigor characterized by other professionals in the relevant field of practice. *See, e.g., Black v. Food Lion, Inc.,* 171 F.3d 308,

311–312 (5th Cir.1999) (indicating that trial judge has broad discretion to employ some or all of *Daubert* factors, or even other factors not enunciated in *Daubert*, as appropriate to facts of specific case in order to ensure overarching goal of scientific reliability of expert testimony).

¶ 23 For these reasons, I would affirm the grant of summary judgment on the basis of Pa.R.C.P. 1035.2(2), since the necessary quantum of causation evidence is lacking in light of Dr. Austin's unreliable opinion.