J-A26016-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| CYNTHIA C. JONES, ET AL. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| MCNAUGHTON COMPANY, PC, ET AL. | |
| Appellee | No. 12 MDA 2015 |

Appeal from the Judgment of December 15, 2014
In the Court of Common Pleas of Cumberland County
Civil Division at No.: 2010-05283

| | |
|---|---|
| CYNTHIA C. JONES, ET AL. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| MCNAUGHTON COMPANY, PC, ET AL. | |
| APPEAL OF: MCNAUGHTON HOMES AND HAMPTON CONSTRUCTION MANAGEMENT, LIMITED D/B/A HAMPTON CONSTRUCTION, LIMITED | No. 105 MDA 2015 |

Appeal from the Judgment Entered on December 15, 2014
In the Court of Common Pleas of Cumberland County
Civil Division at No.: 2010-05283

BEFORE:  FORD ELLIOTT, P.J.E., WECHT, J., and PLATT, J.[*]

MEMORANDUM BY WECHT, J.:                    **FILED DECEMBER 15, 2015**

Cynthia Jones and Daniel Jones ("Appellants") appeal the judgment

entered in their favor on December 15, 2014.  Specifically, they contend that

_____

[*]      Retired Senior Judge assigned to the Superior Court.

the trial court erred in entering a non-suit on their punitive damages claim. As well, they contest the trial court's refusal to qualify Appellant Mr. Jones as an expert on structural damage and causation. McNaughton Homes and Hampton Construction Management (collectively, "Appellees") have cross-appealed, seeking relief on a separate matter solely in the event that we find either of Appellants' issues meritorious.[1] Because we find no merit to Appellants' issues and affirm the judgment, we need not address Appellees' cross-appeal.

The trial court has provided the following brief account of the facts underlying this appeal, which Appellants not only endorse but reproduce:

> [Appellants'] home and property suffered significant damage from flooding and silt spillover resulting from [Appellees'] development of an adjacent property. [Appellants] alleged that this damage was the result of [Appellees'] intentional and deliberate decision to accelerate their development plan by combining multiple development phases into one phase, leading to grossly inadequate swales,[2] an improperly located detention basin, and a mountain of piled topsoil with a very steep grade that led to [Appellants'] property. On the basis of that conduct, [Appellants] demanded punitive damages.
>
> In the early stages of this case, [Appellees] filed [p]reliminary [o]bjections to [A]ppellants' [a]mended [c]omplaint objecting to all allegations of wanton, reckless, and outrageous conduct

---

[1] Although Appellees were found liable for damages, the amount was considerably less than Appellants sought, and Appellees are content to accept the verdict as it stands. Their appeal, therefore, is contingent upon our hypothetical grant of a new trial to Appellants.

[2] A swale is a V-shaped drainage ditch. *See* Notes of Testimony, 12/10/2014, at 45.

J-A26016-15

> contained therein. A two[-]judge panel, including the undersigned, overruled that objection on the basis that the [a]mended [c]omplaint presented a factual question for jury determination. Subsequently, [Appellees] filed a [m]otion for [p]artial [s]ummary [j]udgment as to the question of punitive damages. A panel of judges, speaking through the undersigned, denied that motion on the basis that the question of punitive damages remained a question of material fact to be determined by a jury.
>
> During the jury trial, at the close of [Appellants' case-in-chief], [Appellees] moved for a compulsory non[-]suit on the issue of punitive damages and the court granted that motion, over strenuous objection from [Appellants'] counsel, thereby removing the question of punitive damages from the jury's consideration. Ultimately, the jury returned a verdict in favor of [Appellants] in the amount of $52,480.00. Following the verdict, both parties filed [p]ost-trial motions which were argued before a three[-]judge panel. All motions were denied.

Trial Court Opinion ("T.C.O."), 4/8/2015, at 2-3; *see* Brief for Appellants at 7.

On December 15, 2014, judgment was entered in favor of Appellants. On December 30, 2014, Appellants filed a notice of appeal. On January 12, 2015, Appellees filed their joint notice of cross-appeal. The trial court directed the parties to file concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) in orders entered, respectively, on January 5 and January 13, 2015. The parties timely complied. On April 8, 2015, the trial court filed its opinion pursuant to Rule 1925(a), ripening this case for our review.

Appellants raise the following issues for our consideration:

> A. Did the trial court commit an error of law and/or abuse [its] discretion when [it] granted [Appellees] a compulsory non-suit as to punitive damages?

- 3 -

B.　Did the [trial] court commit an error of law or several errors of law in precluding testimony as to what [Appellants] observed and did in repairing their home after the first few weeks of cleanup because [Appellant Mr. Jones] was not a structural engineer and testimony from a structural engineer was indispensable as to [the] causal relationship between [Appellees'] negligence and damages other than cleanup, *i.e.*, equivalent of [*sic*] partial summary judgment as to structural damages?

Brief for Appellants at 6.　For the reasons that follow, we find that these issues are unavailing.　Consequently, we need not consider Appellees' materially identical cross-appeals, which they submitted for our review only in the event that Appellants prevailed on one or both of their claims. ***See*** Brief for McNaughton Homes at 12; Brief for Hampton Construction Management at 42.

Appellants first challenge the trial court's grant of Appellees' motion for a non-suit at the close of Appellants' case-in-chief, which Appellants pervasively misidentify as a directed verdict.[3]　The legal standard that governs the entry of a non-suit is as follows:

---

[3]　Appellees argue that Appellants have waived their challenge to the trial court's entry of a non-suit, because Appellants do so in the guise of challenging a putative directed verdict.　Rather than challenge the non-suit as such, Appellants treated it as a directed verdict and requested a new trial in their post-trial motion.　It is true that Pa.R.C.P. 227.1 distinguishes between a directed verdict and removal of a non-suit.　It also is true that an entry of non-suit is not appealable unless and until the trial court rules upon a motion to remove a non-suit. ***See Conte v. Barret's Bootery, Inc.***, 467 A.2d 391, 392 (Pa. Super. 1983) ("The right to appeal does not exist until a motion to have a non[-]suit is first filed with and denied by the trial court.").　However, Rule 227.1 provides that one may challenge a non-suit in
*(Footnote Continued Next Page)*

> Our standard of review in determining the propriety of an entry of non[-]suit is that it is proper only if the fact[-]finder, viewing all the evidence in favor of the plaintiff, could not reasonably conclude that the essential elements of a cause of action have been established. ***Biddle v. Johnsonbaugh***, 664 A.2d 159 (Pa. Super. 1995); ***Orner v. Mallick***, 639 A.2d 491, 492 (Pa. Super. 1994). "When a non[-]suit is entered, the lack of evidence to sustain the action must be so clear that it admits no room for fair and reasonable disagreement." ***Gregorio v. Zeluck***, 678 A.2d 810, 813 (Pa. Super. 1996) (citing ***Dion v. Graduate Hosp. of Univ. of Penna.***, 520 A.2d 876 (Pa. Super. 1987)). A compulsory non[-]suit can only be granted in cases where it is clear that a cause of action has not been established and the plaintiff must be given the benefit of all favorable evidence along with all reasonable inferences of fact arising from that evidence, resolving any conflict in the evidence in favor of the plaintiff. ***Coatesville Contractors v. Borough of Ridley***, 506 A.2d 862 (Pa. 1986); ***Poleri v. Salkind***, 683 A.2d 649 (Pa. Super. 1996). The fact-finder, however, cannot be permitted to reach a decision on the basis of speculation or conjecture. ***Biddle***, 664 A.2d at 161.

***Joyce v. Boulevard Physical Therapy & Rehab. Ctr., P.C.***, 694 A.2d 648, 652-53 (Pa. Super. 1997) (citations modified).

Appellants' punitive damage claims appear to hinge upon a lone proposition—that Appellees undertook to perform several different phases of

_(Footnote Continued)_ ————————————

post-trial motions. Here, albeit using incorrect terminology, Appellants raised the trial court's refusal to allow their punitive damage claim to reach the jury, which is the same outcome as would have obtained had the ruling come in the form of a directed verdict. Because the trial court was given due opportunity to change its ruling, and because the trial court addressed the merits of this issue, we decline to find the issue waived for purposes of appeal.

construction simultaneously (Phases XII, XVIII, and XIX),[4] when the governing plans and/or permits required them to reach 70% completion of the earlier phase before subsequent phases could commence.

> The decision to combine three phases into one using a revision to Phase XII only was obviously intentional, the result of deliberate decisions made by [Appellees] without a new combination plan. The earth disturbances took place over a five[-]week period from 8/7/08-9/9/08 with five weeks of <u>daily</u> decisions.
>
> * * * *
>
> There was testimony of extensive trespass onto [Appellants'] land, grossly inadequate swales, a mis-located detention basin, and a mountain of piled top soil with a very steep grade that led to [Appellants'] property.

Brief for Appellants at 17-18 (emphasis in original).

Appellants first argue that the trial court erred in granting a non-suit because the same court, in a two-judge panel including the trial judge, previously denied Appellees' preliminary objections to Appellants' punitive damages claim. Later, the court, in a three-judge panel including the trial judge, denied Appellees' motion for summary judgment on the same claim. They contend that this triggered the law of the case doctrine, specifically the coordinate jurisdiction rule.

---

[4] "Phase" refers to a discrete area of the larger development project. **See** Notes of Testimony, 12/10/2014, at 52-53. Thus, the proposition is that certain conditions in a given area must be attained before work could commence in other areas.

> One of the distinct rules that are encompassed within the "law of the case" doctrine is the coordinate jurisdiction rule. Generally, the coordinate jurisdiction rule commands that[,] upon transfer of a matter between trial judges of coordinate jurisdiction, a transferee trial judge may not alter resolution of a legal question previously decided by a transferor trial judge. More simply stated, judges of coordinate jurisdiction should not overrule each other's decisions.

*Zane v. Friends Hosp.*, 836 A.2d 25, 29 (Pa. 2003) (footnote and citations omitted).

Appellants' coordinate jurisdiction argument overlooks the differences in procedural posture that distinguish a trial court's rulings on preliminary objections, which tests only the sufficiency of the pleadings; summary judgment, which tests only the sufficiency of the plaintiff's proffer of evidence following discovery and other pretrial events; and a motion for a non-suit, which tests the sufficiency of the evidence that plaintiff has adduced at trial.

Appellants cite *Clearwater Concrete & Masonry, Inc., v. West Philadelphia Financial Services Institution*, 18 A.3d 1213 (Pa. Super. 2011),[5] for the proposition that the law of the case doctrine

---

[5] *Clearwater Concrete* was abrogated on different grounds than those for which it is cited herein by *Bricklayers of Western Pennsylvania Combined Funds, Inc., v. Scott's Development Co.*, 41 A.3d 16 (Pa. Super. 2012) (*en banc*). *Bricklayers* was, in turn, reversed on still other grounds by our Supreme Court. *Bricklayers of W. Penna. Combined Funds, Inc., v. Scott's Dev. Co.*, 90 A.3d 682 (Pa. 2014). The propositions for which *Clearwater Concrete* is cited herein, however, are
*(Footnote Continued Next Page)*

"does not preclude a single judge from reviewing his or her previous decisions, [but] it does preclude a judge from reviewing a decision made by a different judge, or by additional judges." Brief for Appellants at 21. But *Clearwater Concrete*, itself, demonstrates the futility of their argument. In *Clearwater Concrete*, this Court noted that the coordinate jurisdiction rule does not apply to bar rulings on summary judgment that diverge from earlier rulings on preliminary objections.

> [A] trial court exercises different types of review for preliminary objections and motions for summary judgment. "When reviewing preliminary objections[,] the trial court looks to the pleadings, but, in considering a motion for summary judgment[,] the trial court weighs the pleadings, depositions, answers to interrogatories, admissions and affidavits." *Herczeg v. Hampton Twp. Mun. Auth.*, 766 A.2d 866, 870 (Pa. Super. 2001).

*Clearwater Concrete*, 18 A.3d at 1216-17 (citation modified); *see Hunter v. City of Phila.*, 80 A.3d 533, 537 (Pa. Cmwlth. 2013) ("[T]he coordinate jurisdiction rule[] does not apply where the motions are of a different type, and does not bar a judge on summary judgment from overruling another judge's decision on preliminary objections . . ., even on an identical legal issue." (internal quotation marks omitted)). As well, this Court has held unequivocally that a grant of a non-suit by one judge is not subject to the coordinate jurisdiction rule when a prior judge denied

*(Footnote Continued)* ———————

consistent with voluminous case law, and we rely upon *Clearwater Concrete* only to illustrate the problems with Appellants' argument.

summary judgment on the same issue, "[s]ince a motion for summary judgment and a motion for non[-]suit are not motions of the same kind." *Parker v. Freilich*, 803 A.2d 738, 745-46 (Pa. Super. 2002); *cf. Ryan v. Berman*, 813 A.2d 792, 795 (Pa. 2002) (holding that the coordinate jurisdiction rule did not bar a judge from allowing defendant to amend answer in light of trial evidence when a different judge had denied a pre-trial motion to do so). Consequently, Appellants' invocation of the coordinate jurisdiction rule is unavailing, and we need not consider it further.

This leaves us to consider Appellants' argument that the evidence presented at trial in support of punitive damages was sufficient to warrant submission to a jury.

> [T]he purpose of punitive damages is to punish outrageous and egregious conduct done in a reckless disregard of another's rights; it serves a deterren[t] as well as a puni[tive] function. *Schecter v. Watkins*, 577 A.2d 585, 595 (Pa. Super. 1990). Therefore, under the law of this Commonwealth, a court may award punitive damages only if an actor's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others. *SHV Coal, Inc. v. Continental Grain Co.*, 587 A.2d 702, 704 (Pa. 1991); *Rizzo v. Haines*, 555 A.2d 58 (Pa. 1989).

*Johnson v. Hyundai Motor Am.*, 698 A.2d 631, 639 (Pa. Super. 1997) (citations modified).

In pressing this issue, Appellants rely heavily upon their pleadings and conclusory assertions about what evidence was adduced at trial, few of which are supported by citations to the record. *See, e.g.*, Brief for Appellants at 17-18 ("Virtually all of the Amended Complaint facts were

[proved] through undisputed exhibits. The testimony at trial focused upon witness after witness confirming the factual allegations of the Amended Complaint and referencing the undisputed exhibits supporting [Appellants'] claims of outrageous conduct by [Appellees] . . . ."); *id.* at 18 ("There was testimony of extensive trespass onto [Appellants'] land, grossly inadequate swales, a mis-located detention basin, and a mountain of piled top soil with a very steep grade that led to [Appellants'] property."). Appellants ask, "What happened to the Amended Complaint allegations? Why did they suddenly become insufficient? What about the Court's own statement of facts?" *Id.* at 20. Faced with such a flurry of rhetorical questions, our answer typically is "You tell us." Appellants never do.

The trial court explains the basis for its grant of a non-suit as follows:

[Appellants] failed to introduce . . . evidence of outrageous conduct by either of [Appellees] and therefore the question of punitive damages was not submitted to the jury. We are confident that [Appellees] will regale the appellate court(s) with tales of our wisdom, albeit delayed in surfacing. Similarly, [Appellants] will *respectfully* criticize court rulings in general and this one in particular. Moreover, all parties' briefs will be replete with references to the voluminous transcript. Because our review of this transcript elicited PLSD (Post Litigation Stress Disorder), in deference to the [Superior C]ourt and its clerks, we will not add to your burden.

T.C.O. at 7 (emphasis in original). As it turns out, Appellants' brief not only is not **replete** with such references, it is almost devoid of them.[6]

The principal problem with Appellants' argument is that, in criticizing the trial court for providing insufficient explanation for its grant of a non-suit, they neglect to acknowledge that it is not incumbent upon the trial court to prove a negative, *i.e.*, that Appellants failed to produce sufficient evidence. Rather, it is Appellants' burden to demonstrate with citations to the record and reasoned argument that they **did** produce such evidence. *See* Pa.R.A.P. 2119(c) ("If reference is made to the pleadings, evidence, charge, opinion or order, or any other matter appearing in the record, the argument **must** set forth, in immediate connection therewith, or in a footnote thereto, a reference to the place in the record where the matter referred to appears." (emphasis added)). This is especially important in a case, such as this, with a voluminous trial record. The appellant who expects this Court to comb through a several-thousand-page record in an effort to substantiate the appellant's bald assertions of evidentiary sufficiency will be sorely disappointed.

_____

[6] Neither is Appellants' argument terribly respectful of the trial court. *See* Brief for Appellants at 18 ("It is incomprehensible how the same facts withstood the pre-trial challenges with virtually the same standard of review as a compulsory non-suit, but were not sufficient to withstand [Appellees'] end of [Appellants'] case [m]otion."), 19 ("The [trial court] ignored the standard of review . . . ."), 20 ("The [trial court] ignores the law of the case doctrine, the devastating facts at trial and granted a directed verdict without explaining his reasons.").

As noted, *supra*, Appellants rely more or less exclusively upon their allegations that Appellees recklessly and wantonly commenced work on Phases XVIII and XIX of their plan before phase XII was 70% stabilized.[7] As the trial court notes, by the terms of Appellants' own proffer, they intended to establish that "[e]verything that [Appellees] did intentionally, knowingly, willfully, what I would say wantonly, from the time they took plans that said you were to do [Phases XII, XVIII, and XIX] separately, and they decided to do them together." Notes of Testimony ("N.T."), 12/16/2014, at 19.

Even Appellants' own expert witness, James Cieri, P.E., did not support that assertion:

[Counsel for Appellants]:     Mr. Cieri, we showed you what the 2.4 and the 4.2 acres were which would be [Phases] XII, XVIII and XIX. Did we not point that out yesterday and today?

A.     Yes.

Q.     And the narrative described the sequence in which they were to be constructed. What was the sequence that they were to be constructed from the narrative? . . . .

A.     The plan indicated that they were to do the work in Phase XII, stabilize Phase XII prior to removing the erosion controls, the temporary erosion controls from Phase XII before starting. That was to be stabilized. When Phases XVIII and XIX were implemented, there were separate [erosion and sedimentation] control plans prepared for them.

Q.     Did [the plans] clearly tell [Appellees] that [they] had to finish XII before [they] started XVIII and XIX?

_____

[7]     70% stabilization is a term of art that refers to a condition wherein 70% of a disturbed area of land is stabilized with grass, matting, mulch, or other permissible means. *See* Notes of Testimony, 12/10/2013, at 40-41.

A.    I don't think that the narrative[8] clearly said that.

Q.    But how about the [erosion and sedimentation] plans that were created separately for XII, and separately for XVIII and XIX.  Did that clearly tell them that?

A.    I do not recall that telling them that either.  The narratives were very similar in that they said that prior—what it said was that the areas of disturbance needed to be 70 percent stabilized before removing the temporary control measures.  That's what both of them said.

N.T., 12/13/2013, at 64-65.

More importantly, though, we must bear in mind that, even if there was a deviation from a plan provision that, on its face, required that Phase XII achieve 70% stabilization before site work proceeded on Phases XVIII and XIX, more than that must be demonstrated to establish a factual basis upon which a jury might find, by clear and convincing evidence, that either Appellee acted maliciously, wantonly, willfully, oppressively, or exhibited a reckless indifference to the rights of others.  **See Johnson**, *supra*.  Appellants' own expert refused to aver that the plans that were approved by the Cumberland County Conservation District ("CCCD") categorically required that Phase XII be 70% stabilized before work could commence on Phase XVIII or XIX.

_____

[8]    "Narrative" refers to a written description of the erosion and sedimentation control plan, which details "the controls that keep . . accelerating sedimentation from occurring."  **See** N.T., 12/10/2013, at 18.  It attends the plans that were submitted to the Cumberland County Conservation District for approval.

In an extensive examination of Kimberley Falvey, the district technician for CCCD responsible at all relevant times for the construction at issue in this case, Appellants failed in their efforts to elicit from her a clear statement that Appellants were precluded by the plans that she approved from proceeding simultaneously on Phases XII, XVIII, and/or XIX. Furthermore, Ms. Falvey testified that, as of August 21, 2008, her last visit to the site before the September 9, 2008 flooding underlying Appellants' claims, she determined that the erosion and sedimentation measures implemented on the site were compliant with the approved plan and conformed to her earlier August 14, 2008 identification of certain additional measures that were required. *See* N.T., 12/10/2013, at 170-72. Furthermore, Ms. Falvey approved the repairs that she observed in her first post-flood visit to the site on September 15, 2008. *Id.* at 172-73.

To be clear, none of this suggests that Appellees at all times were fully compliant with the approved plans. To the contrary, Ms. Falvey testified to site plan deficiencies before and after the flood. However, she also testified that the problems she observed, once identified, were corrected. However, evidence of more than incidental, temporary non-compliance is necessary to provide a basis upon which a jury could have concluded that either Appellee acted with the requisite state of mind to sustain an award of punitive damages. Ms. Falvey's testimony that she determined that Appellees were fully in compliance with the approved plans as of August 21, 2008, the date of her last site visit before the September 9, 2008 flood, is hardly consistent

with claims that Appellees acted with the requisite ill will or recklessness necessary to establish a factual basis for the imposition of punitive damages. To the contrary, it suggests that they had every reason to believe that they were in compliance with the approved plan at that time.[9] While there could, in theory, be a factual dispute about these matters, one that would require a jury determination, but Appellants provide only vague, conclusory arguments to that effect, which lack any citations to testimonial evidence that would establish such a factual dispute regarding Appellees' conduct. This is why the trial court entered a non-suit in favor of Appellees, and it is why we affirm that ruling.

Appellants' second issue embodies two separate trial court determinations. First, they nominally contest the trial court's determination that, before claims of structural damage arising from the flood could be submitted to a jury, Appellants were obligated to produce an expert witness to establish that such damage was caused by the flood. Second, they argue that, following that ruling, the trial court erred in finding that Appellant

_____

[9] This does not categorically preclude the possibility that at some time between August 21, 2008, and September 9, 2008, Appellees modified the site and/or the sedimentation controls in ways that were non-compliant with the approved plans. However, Appellants' allegations and trial evidence, as well as their argument before this Court, do not provide a factual basis for such an occurrence, let alone that any such modification involved the requisite intent necessary to support punitive damages.

Mr. Jones was not qualified as an expert on the question of structural damage and its causation. We address these contentions in turn.

With regard to the necessity to produce expert testimony in support of causation, Appellants provide no legal argument. Rather, they merely **suggest** challenges to the necessity of expert testimony on two occasions.[10] They dedicate virtually all of their argument, as such, to establishing Mr. Jones' putative expert qualifications. Consequently, any intended substantive challenge to the trial court's threshold determination that expert testimony was required to present a claim for certain damages is waived and will not be considered. *See* Pa.R.A.P. 2119(a) (requiring appellant to develop argument with reference to, and analysis of, relevant legal authority); ***Burgoyne v. Pinecrest Community Ass'n***, 924 A.2d 675, 680 n.6 (Pa. Super. 2007).

This leaves only the question whether Mr. Jones was qualified to testify as an expert regarding the causes of any structural damage to the home, a proposition made more complicated by the fact that Appellants undertook

---

[10] *See* Brief for Appellants at 23 ("[The trial court] abused its discretion in its drastic limitations, **need for expert testimony**, finding Mr. Jones' lack of qualifications, and directing the jury as to the specific damages and amounts that could be awarded . . . ." (emphasis added)), 24 ("Even if expert testimony [was] required to casually [*sic*] relate the repairs following the first few weeks of cleanup, Mr. Jones satisfied the prerequisites to testify that he observed 'structural damages' and corrected same.").

repairs more or less immediately after the damage occurred, and before

Appellees' expert engineer could inspect the property.

> [T]he standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has **any** reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine. It is also well established that a witness may be qualified to render an expert opinion based on training and experience. Formal education on the subject matter of the testimony is not required . . . . It is not a necessary prerequisite that the expert be possessed of all of the knowledge in a given field, only that he possess more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience.

*Miller v. Brass Rail Tavern, Inc.*, 664 A.2d 525, 528 (Pa. 1995) (citations

omitted; emphasis in original). We review a trial court's qualification or

disqualification of a proposed expert witness for an abuse of discretion. *Id.*

In its opinion, the trial court primarily refers this Court to its pre-trial

ruling, wherein the court indicated that it would allow Appellants the

opportunity to qualify Mr. Jones as an expert witness, but expressed

skepticism regarding their ability to do so.

> [T]he court is reluctant to qualify Mr. Jones as an expert in the field of construction and structural damage. His apparent lack of professional experience is significant. [Appellants] will have an opportunity to attempt to qualify Mr. Jones as an expert at trial, but that attempt may very well fail. Absent his qualification as an expert, Mr. Jones will be limited to describing events but precluded from opining as to their cause.

T.C.O. at 8 (quoting Trial Court Order In re: Pretrial Motions, 12/6/2013,

at 7). In the same pretrial ruling, the trial court also observed that, if

Appellants succeeded in establishing Mr. Jones' expert qualifications, the issue of spoliation would be "amplified" because Appellants' undisputed spoliation effectively denied Appellees' expert's ability to form an opinion regarding causation. ***Id.***

Setting aside those aspects of Appellants' argument that are irrelevant to the one question properly preserved and argued, *i.e.*, whether Mr. Jones should have been qualified as an expert, we are left with the following conclusory argument:

> Mr. Jones' construction experience began when he was five years old, where he was exposed to construction projects with laborers in Mexico. His learning in this field began at that time, and has developed ever since. Throughout high school and college, Mr. Jones worked on major construction projects, including the design and construction of a special garage, wherein the entire front wall (rather than just the door) lifted. Mr. Jones designed the garage in this fashion to camouflage the fact that the structure was a garage and to try to prevent break-ins.

> After marrying Mrs. Jones, the two [*sic*] purchased numerous properties and renovated them before turning them into rental properties and eventually selling them at up to five times their purchase prices. Mr. Jones is familiar with and has been using major construction equipment for years, including on the property which forms the subject of this lawsuit. Mr. Jones is familiar with different types of foundations and—specifically—the type of foundation existing at his present home and barn as consisting of stones without mortar or footers. He knows what structural damage is and what is needed to correct the damage. He knows that the damage did not exist and was not present for the hundred years before the [September 9, 2008] flood. Using major construction equipment, he has completed projects he hired professionals to do, and he also constructed an underground tunnel between the Jones' primary home and their adjacent garage.

\* \* \* \*

- 18 -

Although he did not receive a formal degree in structural engineering or architecture, Mr. Jones enrolled in many of the same classes as those who did—including mathematics, calculus, physics, and the like.[11]  He received the highest marks in these classes and oftentimes, at the request of his peers who were enrolled in engineering courses, assisted them with their coursework.

Brief for Appellants at 27-28.  Referring to the fact that Pennsylvania employs a generally liberal standard for expert witness qualification, Appellants insist that the above-mentioned background qualified Mr. Jones to educate the jury regarding the causal relationship between the flood and structural damage to Appellants home.

Appellee Hamilton Construction notes that Mr. Jones' testimony regarding structural damages and causation "would necessitate a demonstrated understanding of earth movement, structural design, and forensic engineering."  Brief for Hamilton Construction at 36.  They emphasize that Pennsylvania statutory law defines what constitutes architecture and engineering, and imposes licensure requirements on those practicing either art.  *Id.* at 36-37 (citing 63 P.S. § 34.3 ("architects licensure law"); 63 P.S. § 149 ("Engineer, Land Surveyor and Geologist Registration Law"); 63 P.S. § 150 (prohibiting the practice of engineering or geology without a license)).  Mr. Jones undisputedly was licensed in none of these disciplines, in Pennsylvania or elsewhere.  In addition to establishing

---

[11]    Ostensibly, these classes were taken in furtherance of his studies toward the degrees he earned in computer science.

Mr. Jones' lack of study or practice in the above-enumerated disciplines, Hamilton Construction observes that Mr. Jones acknowledged hiring an engineer when he rebuilt his garage.  ***See id.*** at 38-39; ***see also*** Brief for McNaughton Homes at 27 ("As the [trial court] pointed out, Mr. Jones had some experience with a hammer and a backhoe, but he did not have the training and experience that would qualify him to offer opinions as to a causal link between [Appellees'] activities and the claims of structural damage, especially in light of the extensive prior excavations of the foundation and removal and/or alterations of five of the six foundation walls.").

Hamilton Construction further reviews Mr. Jones' qualification testimony and finds it wanting.

> Given the complexities of the forces and factors involved, the following opinions that [Appellants] sought to elicit from [Mr.] Jones required expert testimony:
>
> (1) that [the] south wall of the foundation settled; (2) that any proven settlement caused the structural problems identified in the house; (3) that the September 9, 2009 storm caused these structural problems; and (4) [that] the remedies chosen by [Appellants], including excavation of all soils adjacent to and below the foundation of the entire south wall, demolition of the entire south wall, replacement of extensive portions of the house including the south wall, the foyer, and [a] portion of the roof.[12]

---

[12]    Presumably this incomplete sentence was intended to assert that it was incumbent upon Mr. Jones to establish that the remedies he choose
*(Footnote Continued Next Page)*

*Id.* at 39-40.

Hamilton Construction further contends that Mr. Jones' testimony regarding the basis upon which he concluded that the flood caused the damages in question was insufficient. Specifically, Hamilton Construction argues that Mr. Jones' reasoning improperly relied upon the *post hoc ergo propter hoc* fallacy, *i.e.*, the inference that B follows A because A caused B, a proposition consistently rejected by the courts. *Id.* at 40-41 (citing **Haney v. Pagnanelli**, 830 A.2d 978, 987 (Pa. Super. 2003) ("*Post hoc* [*ergo propter hoc*] describes the fallacy of assuming causality from temporal sequence; confusing sequence with consequence.")).

Hamilton Construction raises what amounts to a "**Frye** challenge" when it cites **Haney**. **Frye** governs the admissibility of expert methodology and opinion.[13] That question, though, is distinct from the inquiry that informs expert witness qualification in the first instance. Indeed, a substantial portion of Hamilton Construction's brief can be understood more as in the nature of a **Frye** challenge than as a defense of the trial court's

*(Footnote Continued)* ───────────

**were necessary and appropriate** in light of any damage caused to the home. **Cf.** Brief for McNaughton Homes at 26 (so stating the issue).

[13] **See Frye v. United States**, 293 F. 1013 (D.C. Cir. 1923), *superseded by federal rule as stated in* **Daubert v. Merrell Dow Pharma., Inc.**, 509 U.S. 579 (1993), continues to supply the standard by which experts' methodology and conclusions are tested for admissibility in Pennsylvania. **See Grady v. Frito-Lay, Inc.**, 839 A.2d 1038, 1044 (Pa. 2003). However, this inquiry does not bear on an expert's qualifications; it affects only the substance of his or her opinions.

determination that Mr. Jones was unqualified to testify as an expert to the fact and cause of structural damage to his home.

Given Pennsylvania's liberal standard, we grant *arguendo* that Mr. Jones' experience working on remodeling projects, including the digging of a tunnel and significant foundation work, at least on his own home, before 2008, qualified him, if barely, to testify regarding his observations of the damages and the remedies he chose to implement upon discovering the damage in question. On this point, the trial court agreed. ***See*** N.T., 12/13/2013, at 154-56 (clarifying that, based upon Mr. Jones' undisputedly extensive practical experience in construction, the court would allow Mr. Jones to testify regarding the remedial steps he had already taken to address the damages at issue in this case, but denying his qualifications to speak to the causal relationship between the flood and the structural damages and denying him the prerogative to testify as to what repairs might be required in the future as a result of any damage caused by the flood). However, nothing in Mr. Jones' testimony speaks to his qualification to speak to what **caused** any such damage. Despite testifying to a lifetime of construction and related activities, albeit as a hobby or "avocation" (to use the trial court's word), Mr. Jones did not testify directly to any experience with geology or any activity requiring the forensic divination of the fact or cause of structural issues associated with a flooding event like the one at issue in this case.

While Pennsylvania's standard for expert qualification is not overly stringent, it is, nonetheless, a standard. Furthermore, as noted, Appellants have failed to preserve any challenge to the trial court's determination that expert testimony would be required to establish causation. We are left with the trial court's ruling that the establishment of causation required expert testimony and that Mr. Jones would not be allowed to provide it. We have no testimony whatsoever that establishes that, in Mr. Jones' admittedly extensive if informal experience on various types of construction, he ever had occasion to learn how to infer causation in a case involving structural damage arising from a flood or similar event.

In light of these considerations, we find that the trial court did not abuse its discretion in refusing to qualify Mr. Jones as an expert or in precluding him from testifying as to causation. Consequently, Appellants are not entitled to relief from this ruling.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/15/2015